WALTER SHAFER, Respondent, v. O. D. HATFIELD, Appellant, No. 41128—223 S. W. (2d) 396.

Division One, September 12, 1949.

Rehearing Denied, October 10, 1949.

*Roy Coyne* for appellant.

674

*McReynolds & Flanigan, Laurence H. Flanigan* and *John H. Flanigan* for respondent.

BRADLEY, C.—Action to cancel and set aside a deed to 8-⅓ acres of land in Jasper County on the ground of alleged undue

influence; there was a second count in ejectment to recover possession and damages. The trial chancellor cancelled and set aside the deed; entered judgment for plaintiff for $750.00 damages and for posses-sion; defendant appealed.

Respondent died after the appeal was taken, and on motion here Guy W. Shafer, administrator of the estate, and Michael M. Shafer and Anna King were substituted as respondents as to the judgment on count one, and the administrator was substituted respondent as to the judgment on count two. Deceased left no widow or lineal heirs; Michael M. Shafer and Anna King are brother and sister of deceased and his only heirs; Guy W. Shafer, administrator, is the son of Michael and nephew of deceased. To accommodate the situation the term respondent throughout this opinion has reference to deceased unless otherwise noted.

Respondent had owned 160 acres of land; the land was sold and the proceeds invested in two houses and lots in Carthage, and the 8-1/3 acres place here involved. The title to each of these properties was in respondent and his wife by the entirety. Respondent was born in 1881; the deed here involved was executed by him April 13, 1948, on same day that he and his wife were divorced on the cross bill of the wife; the deed was subsequent to the divorce. Also, on same day and subsequent to the divorce, respondent, pursuant to a property settlement, conveyed to his divorced wife his undivided interest in the two houses and lots in Carthage and she conveyed to him her undivided interest in the 8-1/3 acres and gave him her check (cash) for $800.00. At the time of the separation which we may say was September 5, 1944, respondent and his wife resided on the 8-1/3 acres place.

For some years prior to the execution of the deed here involved respondent had been in poor health; he had a paralytic stroke in 1936 and in 1940. His wife, before the marriage, was Charlotte Buckingham; they were married in 1918. Appellant, with his family, resided across the road from the 8-1/3 acres place. September 5, 1944, respondent was taken to what is termed a mental institution; remained for a month; was taken back home by his nephew, Guy W. Shafer, now the administrator. While respondent was at the mental hospital his wife locked up the house and went away. After returning home respondent's brother Michael and his nephew Guy, and another, stayed with him some; appellant and his wife also looked after him. Respondent unsuccessfully sought to make arrangements for his. keep with a Carthage convalescent home. Appellant and his family were kind and attentive to respondent and he entered into some kind of a verbal agreement or contract with appellant respecting his care and keep.

Respondent filed suit for divorce December 12, 1944, and on December 15th a contract between respondent and appellant was re-

duced to writing. The written contract provided that appellant and family would move into the home of respondent; look after and care for him; provide for his meals, etc.; that until property settlement was made between respondent and his wife, respondent would pay appellant $60.00 per month for his board and services to him; that appellant would pay respondent $20.00 per month for rent. The contract provided that respondent would convey to appellant "all of the property owned by him" after the property settlement was made, costs of divorce suit paid, etc. As stated, exchange of property settlement deeds was made on April 13, 1945, date of divorce, and on same day respondent conveyed the property in question to appellant. John H. Flanigan, Jr. and R. A. Mooneyham, attorneys, represented respondent in the divorce case and property settlement; the property settlement deeds were signed by respondent in Mr. Flanigan's office in Carthage; Mr. Mooneyham was present; but the deed to appellant was signed at his (respondent's) home later in the day (evening). Mr. Mooneyham prepared the deed and took it out to respondent's home. This deed was not mentioned at Flanigan's office.

Mr. Mooneyham drew the contract dated December 15, 1944, between respondent and appellant, but according to Mr. Flanigan, Jr., he did not know about that contract and appellant's deed until June 7, 1945. Mr. Flanigan had told respondent that he would prepare his will, and in ten days or two weeks after April 13th respondent called Flanigan about the will. If appellant's contract and deed were valid respondent had no property to dispose of by will. Guy W. Shafer, respondent's nephew, had ascertained that appellant was trying to get insurance on the house on the 8-⅓ acres place; told Mr. Flanigan, who made investigation and ascertained about the contract and the deed. On June 7th or 8th, respondent went to his brother Michael's home and this cause was filed June 9, 1945.

Respondent's health remained bad and his counsel, fearful that he might die, served notice to take his deposition on June 22, 1945. Appellant sought and obtained a continuance on the taking of the deposition. Respondent's counsel then sought from a judge of this court a commission to take depositions to perpetuate evidence. See Secs. 1953 et seq. R. S. 1939, Mo. RSA Secs. 1953 et seq. The commission was not issued but respondent's deposition was taken July 26, 1945. Respondent was not able to attend court at the time of the trial and his deposition was read in evidence. As to the contract respondent testified:

"I had an understanding with Mr. Hatfield to pay him $50.00 per month; I was to take out $20.00 for rent; I rented the place to him; he was to take care of me; he paid the taxes and for what doctors I had (with respondent's money); he paid the insurance with my money; he drew checks on my bank account; he remained in charge of my business until I left June 7th or 8th 1945; no one nursed me

and took care of my person; I was able to take care of myself; no one had to bathe me; I shaved myself; my meals were served at the table. Mr. Hatfield and his wife were kind and considerate of me. Mr. Hatfield suggested that I go see Mr. Mooneyham (about the divorce); he took me to see him; he thought Mooneyham was a good lawyer; both belonged to the same church and the same lodge; Mr. Hatfield was not very high on Young John Flanigan; didn't recognize him much; I told Mr. Hatfield about Young John being my lawyer; I told him he (Flanigan) had done my business for me before. I told Mr. Hatfield that I had already hired Young John in the divorce suit, but he wanted Mr. Mooneyham to go ahead with it until Young John was off the bench (Flanigan, Jr. was on the circuit court bench; his term expired December 31st; the divorce suit was filed December 12th). I told Mr. Mooneyham to go ahead until Young John was off the bench.'' Mr. Mooneyham prepared the divorce petition; submitted it to Flanigan, Jr. who signed it with Mooneyham.

After Flanigan, Jr. was off the bench he participated in the negotiations that resulted in the divorce and the property settlement. In the evening, about sundown, of December 15, 1944, three days after the divorce suit was filed, Mr. Mooneyham and his secretary, who was a notary, went to respondent's house where the contract was signed and acknowledged by respondent and appellant; respondent said that he did not read the contract and that it was not read to him; that he never saw the contract after he signed it; that after that (the signing) he asked appellant a couple of times about it, but that appellant put him off; respondent said that the contract provided for him to pay appellant $50.00, less the $20.00 per month for rent, but the contract itself provided for $60.00 and $20.00. Asked if he signed the deed April 13th he said, ''Not that I know of''.

''Q. Did you know that that purported to be a warranty deed from you to O. D. Hatfield? A. I did not. Q. Conveying to him your acreage west of town for a consideration of $1.00 and other good and valuable consideration, did you know that? A. Never got the deed even; I got that information from young John Flanigan when I called him up. Q. Walter, did you ever at any time knowingly sign a deed to convey your eight and a quarter (third) acres to O. D. Hatfield? A. Never did, no. Q. Did you ever sign any paper at all between you and Hatfield except the one you described awhile ago? A. Signed contract is all, and he claims he destroyed that. Q. My question was, Is that contract the only paper you ever signed between you and Hatfield? A. That is all I know of. Q. If you actually signed a deed, this deed that was recorded April 16, 1945, can you imagine how or when you signed it? A. I don't see how a man could be damn fool enough to do it. Q. Do you recall that young John (Flanigan) and Frank Birkhead (attorney for re-

678

spondent's wife) and our secretary and I came out to your house one day (June 7th) this last summer, this summer? A. That is when I was surprised. Q. Is that when you first found out about this deed business? A. That day. . . . Q. Then you signed that paper (the contract) because Mooneyham handed you a pen and said, 'Sign'? A. Yes. Q. Is that the reason you did it? A. The confidence I had in Mooneyham and Hatfield. . . . Q. Did anybody ever talk to you about deeding your land to him (Hatfield)? A. No.''

The second paragraph of the contract recites that the first party (respondent) ''is at the present time and has been for some time past in poor health physically and his condition is such that he requires the presence with him at all times of someone to wait upon and nurse him, prepare his meals''; that the second party (appellant) ''is an able-bodied man and his wife is a strong healthy woman, both of whom have been very kind to me and in consideration of services heretofore rendered and hereafter to be rendered'' it is agreed, etc. The third paragraph provides that appellant, his wife and children will move into respondent's home; ''look after and care for me to see that my meals are properly provided and extend to me such care and service as may be required''. Also, the contract in the third and fourth paragraphs provides that, pending the property settlement, appellant was to get $60.00 per month for respondent's keep and was to pay $20.00 per month for rent. The fifth paragraph recites that respondent had no money just then to pay for his keep, but that he and his wife owned the three pieces of property (heretofore mentioned) jointly and that a divorce suit was pending and that appellant anticipated some of this property in his own name after the divorce.

The sixth paragraph provided that when property settlement was made and respondent had his part in his own name he would, after paying court costs, attorney fees, and any other expense required by him, convey to appellant ''*all of the property* owned by him after the aforesaid deductions as and 'for payment of the aforesaid $40.00 per month cash payment (rent deducted) which may be in arrears and for the care and support of the party of the first part *as long as he shall live*'' (italics ours). *All* of the property would include that left out of the $800.00 received from his wife in the property settlement and whatever household goods he had. If there was no provision suggesting the duration of appellant's obligation to care for respondent except as in paragraph six, it might be argued that the duration was for respondent's life. But paragraph seven specifically provided that ''if the charges hereinbefore agreed to shall exhaust the reasonable market value of said property'' (the 8-⅓ acres) then appellant's obligation to respondent would cease. The value of the 8-⅓ acres at the time of the trial was about $4000.00.

Error is assigned (1) on the refusal of the trial chancellor to strike specified portions of paragraphs 9, 11, 13, 15, and 18 of the petition; (2) on the refusal to dismiss the cause "for the reason that John H. Flanigan, Sr., who tried the present cause for respondent, picked said lawsuit out of thin air, and for the reason that John H. Flanigan, Sr., because of picking said lawsuit out of thin air, did not have the right nor authority to file the suit for plaintiff"; (3) on the ground that the court erred in finding for plaintiff "on the theory of a unilateral contract"; (4) on the refusal to suppress the deposition of plaintiff; and (5) on denying defendant's motion to dismiss at the close of the case. During cross table talk at the trial counsel for appellant asked Mr. Flanigan, Sr. who employed him in the case and Mr. Flanigan said that he picked the case "out of thin air". Such explains the thin air reference.

Appellant makes no attempt to develop the first two assignments, hence these will be taken as abandoned. As to assignment No. 3, it is sufficient to say that the trial chancellor did not find for respondent "on the theory of a unilateral contract". The decree recites that "the court finds on the first count of the petition that the defendant, O. D. Hatfield, was the nurse, caretaker and confidential agent of the plaintiff, occupying toward the plaintiff a position of trust and confidence; that when and while said relationship of trust and confidence existed between plaintiff and defendant, the defendant, by the exercise of undue influence, obtained from the plaintiff a warranty deed (in question) . . . and that said warranty deed was not supported by an adequate or any consideration and is null, void and of no effect and should be cancelled, annulled and for naught held". The judgment goes on to dispose of the second count.

Did the court err in overruling the motion to suppress respondent's deposition Appellant, in the brief, says that he, at the time of the taking of the deposition, "did not have that fair right that the law gives him to cross examine the plaintiff". Appellant says, in effect, that attorney John H. Flanigan, Sr., who appeared for respondent at the taking of the deposition, so conducted himself that Mr. Coyne, who appeared for appellant, was not able to properly cross examine respondent. On cross examination Mr. Coyne interrogated respondent about pertinent matters generally from the time he returned from the mental hospital; covered about eight pages of the transcript before Mr. Flanigan, Sr. said anything at all. Respondent had testified that he understood that the contract between him and appellant was that he was to pay $50.00 for his keep and that appellant ▆▆▆ was to pay $20.00 rent. Mr. Coyne asked, "Where did you get that"? Thereupon Mr. Flanigan said, "Let him answer." Respondent apparently became confused and answered, "I was supposed to pay $30.00 for the rent of the place; I was supposed to pay $30.00 for the whole thing. Mr. Coyne: You

don't mean you were supposed to pay $30.00 for the rent of the place; you mean you were to pay them $30.00 for your keep, is that right? A. I guess probably I did. Q. You got that from the contract, didn't you? A. That is supposed to be the contract. Q. You got it from the contract, didn't you? A. Yes. Q. How did you get it from the contract? Mr. Flanigan: He means did you ever read the contract? Mr. Coyne: No, no. A. I never read the contract. Mr. Coyne: How did you get that from the contract if you didn't read it? A. That was just a verbal contract. Q. I am talking about this written contract that was dated on December 15th; you say that you got it from the contract; how did you get it from the contract''? Then the record shows as follows:

"Mr. Flanigan: Wait a minute. All I want is a clear understanding; Mr. Coyne is asking you if Mooneyham was out at your place on December 15th. Mr. Coyne: Wait a minute; I am objecting. Mr. Flanigan: With a written contract. Mr. Coyne: I am objecting to the attorney asking some questions at this time. This is cross examination and the witness has answered. Mr. Flanigan: I am here to protect his man. Mr. Coyne: I want him protected. I am not going to run over him. Just trying to get the facts. Mr. Flanigan: I am going to explain to the witness. Mr. Coyne: Wait a minute before you explain anything, I am objecting to the attorney for the witness here making any suggestions to this witness at this time. Mr. Flanigan: Very well. I want to explain to you, Walter (respondent), you have already testified about Mooneyham coming out to your place about the night of the divorce. And about how you signed a paper that night in April, 1945. Mr. Coyne is asking you if Mooneyham wasn't out there in the middle of December with a written contract. Was he or wasn't he? A. I couldn't say for sure about that. Q. (By Mr. Flanigan) Did you ever see more than one written contract? A. No. Q. Did Mooneyham on two different occasions hand you a paper? Mr. Coyne: To all of this I am objecting. Mr. Flanigan: That is understood you may put a general objection in. Mr. Coyne: All right. Mr. Flanigan: Let the record clearly show that Mr. Coyne is objecting to my interference with this cross examination. Mr. Coyne: That is right. Q. (By Mr. Flanigan) I want to ask you now, Walter, subject to Mr. Coyne's objection, did Mr. Mooneyham on two different occasions show you a paper which he said was a contract, or did it only happen one time? A. Just one time. Q. And what was that one time? What date was it? A. I couldn't say about the date. Q. Well, was it in December, or was it the day of the divorce? Was it after your divorce, after your wife got the divorce, or was it when Hatfield moved in with you in December? A. After I got the divorce. Q. (By Mr. Coyne) You have been testifying that it was in December. A. That is when Hatfield moved in. Q. And when was it you signed the contract? We

will go over it again. A. I couldn't say about that. Q. You couldn't say? A. About that date, no. Mr. Coyne: That is all.''

It is quite apparent that Mr. Coyne was not prevented from making a proper cross examination of respondent. Mr. Flanigan's interposition into the cross examination as appears in the record set out above may not have been entirely proper, but he was representing a client who evidently was weak mentally and physically and he did no more than to become perhaps a bit too zealous. It would appear that Mr. Coyne, of his own accord, abandoned further cross examination. At the time he did so Mr. Flanigan was making no objection or suggestions. No case or text is cited in support of the motion to suppress, and our research has found no authority that would support suppression. The motion to suppress was properly overruled.

Should appellant's motion to dismiss have been sustained and the cause dismissed? The motion to dismiss, in a non jury case, takes the place of the demurrer to the evidence under the practice prior to the effective date of the new code. Sec. 100 Laws 1943, p. 385, Mo. RSA Sec. 847.100; Munday v. Austin et al., 358 Mo. 959, 218 S. W. (2d) 624, 1. c. 631. In other words appellant says, in effect, that the evidence considered in its most favorable light, together with all the fair inferences to be deduced, does not justify the judgment setting aside the deed. The record abundantly reflects that respondent was in somewhat of an extremity when he and appellant entered into the verbal agreement for appellant and his family to move in; his brother, his nephew and another had stayed with him some, but had gone away; he had unsuccessfully endeavored to arrange with a convalescent home for his keep. He was too incapacitated physically to live alone; the record reflects, too, that his mental health was not much better, if any, than his physical. Appellant and his family looked after him, took his meals to him, and appellant stayed with him some before there was any agreement. The above narrated part of respondent's evidence would imply a much better mind than his answers as a whole reflect. Respondent was no doubt grateful to appellant and his family and justly so.

According to respondent's case Mr. Mooneyham did not disclose to his associate counsel, Mr. John Flanigan, Jr., that respondent had signed the contract dated December 15, 1944, three days after the divorce suit was filed; there were many conferences between counsel for respondent in the divorce suit (Mr. Mooneyham and Mr. Flanigan, Jr.) and Mr. Birkhead, counsel for the wife, yet at no time, according to respondent's case, did Mr. Mooneyham mention this contract. Mooneyham testified that he thought he had mentioned it. And too, it is not without significance that appellant himself sort of *pushed* respondent to Mr. Mooneyham; they belonged to the same church and lodge; and Mr. Mooneyham, the implication is, from re-

spondent's evidence, did not have a very good opinion of Mr. Flanigan, Jr. who had been counsel for respondent theretofore and apparently had rendered satisfactory service; and respondent had informed appellant that Flanigan, Jr. was his counsel. It could serve no purpose to say more about Mr. Mooneyham; we do not mean to reflect adversely on him.

It cannot be fairly said that respondent and appellant dealt with each other at arm's length. "What constitutes undue influence is a question depending upon the circumstances of each particular case. It is a species of constructive fraud which the courts will not undertake to define, by any fixed principles, lest the very definition itself should furnish a finger board pointing out the path by which it may be evaded." 12 Am. Jur., Contracts, Sec. 148, p. 640. This text goes on to say in the same section: "Whenever the relationships between the parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that unfair advantage in a transaction is rendered probable either because of superior knowledge of the matter derived from a fiduciary relationship or from overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side, the presumption is that the transaction is invalid, and it is incumbent on the stronger party to show affirmatively that no deception was practiced or undue influence used and that everything was fair, open, voluntary, and well understood." See also, 17 C. J. S., Contracts, Sec. 184, p. 541; Holland v. Anderson (Mo. Sup.), 196 S. W. (2d) 175, l. c. 192, and cases there cited.

The Holland case was to set aside a deed; the trial chancellor in that case set aside the deed and that judgment was affirmed. It is stated in that case [196 S. W. (2d) l. c. 191-2] that the trial chancellor found that the grantor "was a man of average mental ability for one of his years. Without saying what that average would be, we think no one can read the record without concluding that the deceased's (grantor's) ability to remember, grasp and coordinate facts had been considerably impaired. And while it is legally possible for undue influence to be exerted on one of sound mind, yet where mental weakness exists it is an important factor to be considered". And that factor is present here.

We do not think it necessary to further extend this opinion; the trial chancellor, we think, reached a just and correct result. The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.