**MILLER v. MINSTERMANN.**

No. 42952.

Supreme Court of Missouri.

Division No. 1.

March 8, 1954.

Motion for Rehearing or to Transfer
to Court en Banc Denied
April 12, 1954.

Morris A. Shenker, Bernard J. Mellman, St. Louis, for appellant.

Milton F. Napier and Louis E. Zuckerman, St. Louis, for respondent.

HOLLINGSWORTH, Judge.

This is a suit in equity to have declared void a deed purportedly executed and delivered by plaintiff conveying to defendant certain residential property located at 8431 Lowell Street in the City of St. Louis.

The trial court found the deed "was not in truth and in fact, executed by plaintiff to defendant, said deed showing on its face as having been materially and substantially changed and altered; that defendant upon oath, on the witness stand, testified that said deed was executed before the notary public at her office in St. Louis, Missouri, and that the alleged grantor and the notary public signed said deed with pen and ink furnished by the notary public and that said deed shows on its face that the signature of the alleged grantor was signed with black ink, and that of the notary public with the usual and ordinary blue-black ink, customarily used in business establishments. * * * that said alleged deed was not executed by the plaintiff herein." A decree was entered declaring the deed void. Defendant appealed on the ground the evidence does not support the finding and decree of the court.

The petition alleged that in 1938, at the solicitation of defendant, she began to "keep company" with him, which association continued through 1947, during all of which time he represented himself to be an unmarried man; that he proposed marriage to her, took her to Canada and there seduced her under promise of marriage; that defendant was in fact married and his wife was confined in a hospital for the insane; that plaintiff's grandmother, Laura B. DeNomy, was and for several years had been the owner of the real property here involved which, prior to May 16, 1941, had become encumbered by liens for unpaid taxes; that it was the wish of Laura B. DeNomy that the property remain her home during her lifetime and then become the home of plaintiff's parents, and thereafter "remain in the family"; that defendant, while engaged to marry plaintiff, offered to pay said taxes; that, on May 16, 1941, Laura B. DeNomy, in consideration of

love and affection and by way of gift, delivered to plaintiff a deed to the property; that defendant offered to "take care of all details"; that defendant brought various papers to Laura B. DeNomy and plaintiff, which they signed; that thereafter plaintiff paid all of the taxes on the property; that in 1947 plaintiff learned defendant was married and broke off all relations with him, and thereafter married her present husband; and that in 1949 she learned the deed here in question had been placed of record on August 6, 1948.

The petition then alleges, "that plaintiff never did at any time deed such property to defendant, and if such deed so recites, was obtained by trick, deceit, misrepresentation and fraud; that if such a paper writing was signed by her, it was represented to her at the time as being application for a driver's license." The petition then further alleges in the next paragraph *"that plaintiff has since learned that defendant tricked her into signing a paper* [the deed here involved] *for him so that if she ever married, he would have her* at his mercy." (Emphasis ours.)

The answer admitted defendant was a married man and categorically denied the other allegations of the petition.

We will first state the admitted facts. Plaintiff, Lorraine Hauschild Miller, was born July 2, 1919. She is the daughter of Edward M. Hauschild, deceased, and Louise L. Hauschild. Laura B. DeNomy, now deceased, was plaintiff's maternal grandmother. Plaintiff's parents were poor and she received only an eighth grade education. Defendant, sixty years of age at the time of the trial in June, 1951, was at all the times herein mentioned a member of the St. Louis Fire Department. He is and for more than twenty years has been married and his wife has been confined in an asylum for the insane.

In 1938, when plaintiff was past eighteen years of age, she began to have dates with defendant. This association continued until 1947. Shortly after plaintiff and defendant began their association, he became a frequent visitor in plaintiff's home, ate many meals there and brought food into the home. He also frequently accompanied plaintiff on visits to the home of her grandmother, Mrs. DeNomy, who owned and resided in the property here involved. She and her husband acquired the property in 1927 as tenants by the entirety. Her husband died in 1929. She "lived" on a pension of about $19 per month. Defendant brought groceries to Mrs. DeNomy and did chores around her home for her. She was very fond of him.

In July, 1940, plaintiff and defendant went to Canada. They also made trips to Chicago, Detroit and Niagara Falls, registering in hotels as "John Minstermann and party" and occupying the same room.

Mrs. DeNomy was and since 1937 had been in default of payment of general and special taxes assessed against the property and was threatened with suit to foreclose the lien thereof. In 1941, a conference was held between Mrs. DeNomy and her several children, in which conference plaintiff and defendant participated, for the purpose of averting, if possible, the impending foreclosure. It is admitted by all of the persons attending the conference that an arrangement was made whereby defendant would discharge the tax liens against the property and Mrs. DeNomy would execute a deed to the property, with the understanding, however, that she would continue to occupy the home so long as she lived. There is a heated dispute as to whom Mrs. DeNomy was to execute the deed: plaintiff and her mother, Louise Hauschild, asserting that the deed was to be made to plaintiff; defendant and the others attending the conference asserting it was to be made to defendant; of which more later.

Following this conference, defendant, on February 28, 1941, paid the general taxes, together with interest accumulations and penalties, amounting in all to $136.28. According to the tax receipts in evidence the property had an assessed valuation of $1,030. Thereafter, a typewritten instrument, admittedly bearing the genuine signatures of the persons whose names are appended thereto, was executed and delivered to defendant, to wit:

"Receipt for Earnest Money.

"Received of John G. Minstermann, the sum of One Dollar ($1.00) as earnest money and part purchase money on account of the purchase of the following described property, situated in the City of St. Louis, State of Missouri, to-wit:

(Property here involved described.)

which property is this day sold to John G. Minstermann for a sum of One Dollar ($1.00) and John G. Minstermann shall assume all indebtedness now existing against said property such as taxes, water license, judgments or any liens whatsoever that may be against said property. In other words, Laura B. DeNomy shall receive a consideration of One Dollar ($1.00) for her equity in the above mentioned property and John G. Minstermann shall receive a Deed to said property subject to all indebtedness now existing against said property as above mentioned.

"Signed this 5th day of March, 1941.
"Mrs. Laura B. DeNomy
Laura B. DeNomy

Witness:
Louise L. Hauschild
"Accepted by:
John Minstermann."

Thereafter, on May 16, 1941, Laura B. DeNomy executed and acknowledged before Harry A. Levi, a notary public, her general warranty deed conveying the property to plaintiff, Lorraine Hauschild. On the same date, Mrs. DeNomy signed and swore to an affidavit before Harry A. Levi, notary public, reciting that she had succeeded to the title to the property as survivor of her deceased husband. Both the deed and the affidavit were recorded on May 22, 1941. On the same day, May 22, 1941, the deed here in question was executed and acknowledged before Ruth Henschen, a notary public at the offices of the Dow Chemical Company in St. Louis, by a woman who came to her office with defendant and declared herself to be Lorraine Hauschild. On August 15, 1941, defendant filed a suit in the Circuit Court of the City of St. Louis seeking a divorce from his wife. A guardian ad litem was appointed to represent her. A trial of that case resulted adversely to defendant herein.

Mrs. DeNomy continued to occupy the property until she became blind in 1942, at which time she took up her residence in an establishment operated by the Little Sisters of the Poor, where she resided until her death in 1946. The property remained vacant until 1944. At that time, plaintiff's parents moved into the house and thereafter, on demand of defendant, paid rent therefor at the rate of $12 per month until 1947, at which time plaintiff's father had become unable to work. No rent was paid thereafter. The rent paid from 1944 to 1947 was delivered to plaintiff, but defendant gave the receipts therefor.

After Mrs. DeNomy executed the deed to the property, defendant put floors in the house, built front and back porches, a concrete walk and steps, put on a roof, repaired the chimney and chimney stack, erected a fence, installed a bathroom and toilet, papered the walls, repaired the plastering, put floors in the basement, installed light fixtures and a front door, painted the house on both the inside and outside, had a survey of the property made and had the title examined.

Plaintiff admitted she began going with her present husband in March of 1947, prior to breaking off her association with defendant in April of 1947. Plaintiff married her present husband on July 14, 1948. On August 6, 1948, defendant filed the deed here in question for record.

The facts in controversy are: (1) the understanding between plaintiff and defendant during the years of their association and whether plaintiff knew defendant's marital status during that period; (2) the understanding with which Mrs. DeNomy deeded the property to plaintiff; and (3) whether plaintiff executed the deed in question purportedly conveying the property to defendant. The evidence bearing upon these facts will be narrated.

*Plaintiff's evidence*:

Plaintiff testified: She began going with defendant in 1938. After an association of about two months she introduced him to her parents. He never told her he was married. She first learned that fact from her sister, Sophia, in 1947, and immediately discontinued her association with him. (Sophia did not testify.) In about 1940, defendant asked plaintiff to marry him and she agreed, but he always had an excuse not to do so. They looked at prospective homes. On a trip to Canada and Niagara Falls, in 1940, they had sexual relations and he gave his word that when they returned home they would be married. They thereafter had such relations regularly.

Mrs. DeNomy had lived alone in the property here involved since 1938. Plaintiff introduced defendant to her grandmother and thereafter plaintiff, her mother and defendant would go to visit the grandmother in defendant's car, which he taught her to operate, and he obtained driver's licenses for her. He also obtained groceries from relief stations and brought them to Mrs. DeNomy, and did work around the house. Plaintiff thereafter paid defendant for all expenditures made by him on the house. She paid him from rentals paid by her mother and out of her own wages, which amounted to $25 per week. During her association with defendant both bought bonds, which were placed in their joint names. When they "broke up", she returned the bonds he had bought. He also took from her at that time presents which he had theretofore bought for her.

The other members of the family were given an opportunity to take over the property when Mrs. DeNomy could not pay the taxes, but Mrs. DeNomy said in the presence of plaintiff and defendant that she wanted to keep it in the family and she "put it in my name, believing that John and I would get married some day." Plaintiff was not present at Harry Levi's office when the transfer was made. After Mrs. DeNomy signed the deed, defendant showed it to her, but said he would keep it with the other papers. She never saw the deed purportedly given by her to defendant until after this litigation arose. She never saw the notary public, Ruth Henschen, and was never in the offices of the Dow Chemical Company, where Miss Henschen took the acknowledgment to that deed. It does not bear her signature.

At the request of her counsel, plaintiff signed her maiden name six times on a sheet of paper which was exhibited to the court. She also identified her signature on driver's licenses for the years of 1939 and 1942. Following in order are photostatic copies of (1) her signature on a 1939 driver's license, (2) her signature on a 1942 driver's license, and (3) the signature on the deed in question.

On cross-examination, plaintiff testified that when she and defendant returned from Canada she told her parents of her sexual relations with defendant. They did not like it, but thought he was going to marry her. Defendant told plaintiff's mother he was going to marry her some day. Defendant paid all of the taxes on the property, but plaintiff repaid him from her savings. Her mother saw her pay him the amount thereof in a lump sum of $112. When her mother paid the rent, defendant would be present. Her mother would give the money to her and defendant would write out the receipt. "He got $12 a month from my mother, from the time we lived there", from 1944 to 1947. Her mother then stopped paying because her father, Edward Hauschild, became ill and defendant made no further demand until 1949.

Plaintiff now generally writes the name "Hauschild" as one word. Formerly she "broke it" in the middle. She now writes it as one word "off and on".

Plaintiff admitted that after the trouble arose between her and defendant, she and her mother tried to get the other children of Mrs. DeNomy to sign a paper showing that they were "willing for the house to be taken from the name of Mr. Minstermann and put in her (the mother's) name", which they refused to do. She admitted that in her deposition she had denied such an effort was made.

Plaintiff's mother, Louise Hauschild, testified: After plaintiff and defendant had kept company for sometime, she would hear defendant say to plaintiff, in substance, "Well, when we are married we will be better off."

"Q. What do you know about Grandma and Mr. Minstermann and your daughter and this property? A. Well, as far as I know, he was supposed to take it over and save it, in order that the daughter would get it. * * *

"Q. How much taxes did he pay, do you know? A. No, I don't; but he paid taxes; I know that."

Shown the earnest money contract, Mrs. Hauschild testified that both she and Mrs. DeNomy signed it, but that witness was not told why she was wanted to sign it, " * * * it was supposed to be signed for protection of some kind"; no one explained what was in the paper; she just signed it. When directly asked by plaintiff's counsel if she signed it for the protection of her daughter, she replied, "Yes, sir." She knew that defendant took plaintiff on the trips to Chicago and elsewhere, but her daughter made no complaints to her and did not tell her of any sexual relations with defendant. She saw plaintiff pay money to defendant for repairs made and taxes paid by him on the property.

Mrs. Hauschild further testified that she learned, when still living on Ninth Street (*which was prior to the time witness and her husband and plaintiff moved to the property in question in 1944*), that defendant was married; and that she told plaintiff what she had heard; and that plaintiff "got discouraged with him then."

On cross-examination, Mrs. Hauschild testified: Shortly after the suit was filed she called defendant and told him she would be happy to pay him back what he had put into the property. She knew he had been repaid, but she wanted to do right about it.

Harry A. Levi, a lawyer and notary public, testified in behalf of plaintiff: He knew defendant and was his counsel at one time about ten years ago. Shown the earnest money contract, he stated he had no recollection of it whatever. Shown the deed executed by Mrs. DeNomy, he had no recollection of it, but stated that it showed he had acknowledged it, and he therefore knew the signer of it acknowledged it in his presence, because he never took any acknowledgment unless the signer was present. He did not remember Mrs. DeNomy, nor the incident. His testimony as to the affidavit relating to Mrs. DeNomy's succession to title to the property by virtue of surviving her husband was to the same effect; and he had no recollection whether he prepared the deed in issue. He repre-

sented defendant in the divorce action brought by defendant against his wife in 1941.

Ruth Henschen, a notary public, testified in behalf of plaintiff: She is and in 1941 was an employee of Dow Chemical Company. She knew defendant; the engine house where he worked was across the street from Dow Chemical Company, and he frequently came into the Dow offices. She has no recollection of acknowledging the deed in question, but it bears her signature and notarial seal. Upon examination of the face of the deed, she "feels" that it appears different than it did when she acknowledged it. "Well, it is not a perfect signature now; it should be." She did not think the signature of the grantor, as it now appears, is the way it was when she took the acknowledgment; she was sure it "was not like this" when she notarized it. It indicates an erasure or an eradication of the given name, an alteration of the given name. She would not have notarized it that way. She kept no record of acknowledgments. She has no recollection of the matter at all, but she knows a lady was there who signed the paper and that defendant was there. She would not know the lady now.

"Q. One question I forgot to ask in regard to the signature of Lorraine Hauschild. You said that in the surname of Hauschild, it appears that one loop of the 'u' (in the signature on the deed) had not been completed, is that right? A. Yes, sir.

"Q. Can you tell us if in your experience of acknowledging signatures on deeds, if that is a real unusual thing for someone to break one loop in one of the letters in their name? Have you ever done anything like that in your name? A. Yes, sir; possibly I have.

"Q. In writing your own name? A. Yes, sir.

"Q. It is a rather ordinary practice, is it not? A. Yes, sir; I do not write too carefully myself."

*Defendant's evidence*:

Mrs. Mildred Pollard testified: She is plaintiff's aunt and a sister of Louise Hauschild. Aged forty-three years, she is the youngest daughter of Laura B. DeNomy and has known defendant since about 1937 or 1938, having met him through plaintiff at the Hauschild home. All of them frequently visited Mrs. DeNomy. Shortly after meeting defendant, plaintiff told her he was married. Defendant frequently visited the DeNomy home during his association with plaintiff. He gave Mrs. DeNomy groceries, bought things for her and gave her money.

In 1941, there was a meeting at Mrs. DeNomy's home. Those present were plaintiff, plaintiff's mother, defendant, Mrs. DeNomy, Mrs. Betty Kehr, a daughter of Mrs. DeNomy, Woodrow DeNomy, a son of Mrs. DeNomy, witness and her husband. Mrs. DeNomy was in dire need of help. None of the family could pay the taxes. Mrs. DeNomy said to defendant that none of the family could help her and that she was about to lose her home, and defendant agreed to pay the taxes. He asked all present if that was agreeable and all said, "Yes." Defendant said Mrs. DeNomy could live there as long as she lived.

About a year prior to the trial, Mrs. Hauschild came to the home of witness and asked her if she "would sign the place over to her, and sign our rates [rights?] away, whether the house would go over to her or to John Minstermann." Witness replied, "I couldn't sign any paper like that for the simple reason it does not belong to any of us, that John Minstermann paid the taxes on it * * *." Mrs. Hauschild then left, saying she wanted to see the rest of the children.

On cross-examination: Defendant told witness at her home in about 1938 in the presence of her husband and plaintiff and plaintiff's mother that he was married and that his wife was in an institution. They were just discussing things as people will.

On re-direct examination: "Q. * * * Was there any conversation at that meeting in 1941 (the conference) about transferring this property? And if so, what was

it, and by whom? A. Yes, sir. It was transferred over to John Minstermann."

Edward Pollard, the husband of Mildred Pollard, corroborated the testimony of his wife as to the conversation in their home relating to defendant being a married man and his wife being in an institution; and testified that at the conference referred to in his wife's testimony Mrs. DeNomy said to defendant, "If you will pay the taxes up for me, I will turn the house over to you." Defendant said he would pay the taxes and that Mrs. DeNomy could have the place as long as she lived. No one objected.

Margaret DeNomy testified: She is the wife of Woodrow DeNomy, who is a son of Laura DeNomy. She was introduced to defendant by plaintiff in about 1942. Thereafter, around 1943, she heard plaintiff say she would like to marry defendant, but he was already married. Later, in the same year, and before witness's marriage to Woodrow DeNomy, plaintiff and defendant and Woodrow were at her apartment. Plaintiff there said she and defendant would like to marry, and either plaintiff or defendant there said that defendant's wife was in an institution.

Woodrow DeNomy testified: He is plaintiff's uncle. He met defendant about 1938, at the Hauschild home. Several months later, plaintiff told him defendant was married. During visits at the Hauschild home, plaintiff and Edna and Sophia discussed the matter, and he also learned that defendant's wife was in an institution for the insane.

Defendant testified, insofar as is pertinent to the facts in controversy: Shortly after meeting plaintiff he told her and her mother he was married. This was mentioned between them time and time again. He never asked plaintiff to marry him. She said she did not want to get married. "She asked me if I would stick with her she would stick with me."

At the conference held at Mrs. DeNomy's home in 1941, Mrs. DeNomy stated it was impossible to pay the taxes and offered to turn her property over to her children if they would do that. None of them was able to do so. She then told defendant if he would pay the taxes, she would turn the house over to him with the understanding she could live in it during her lifetime, to which he agreed. He shortly thereafter paid the taxes. He and Mrs. Hauschild and Mrs. DeNomy went to the office of his attorney, Harry A. Levi, where the earnest money contract was signed. He intended to put title to the property in his name; " * * * and we were discussing that, about putting the property in my name, and I asked them about putting it in Lorraine's name, for the simple reason that at a later date I would be able, instead of going through court, I would be able to sell the property if I wished to, at some later date." Levi suggested the title be in the name of a single person and defendant suggested it be put in plaintiff's name. A deed was prepared in Levi's office conveying the property from Mrs. DeNomy to plaintiff and there signed by Mrs. DeNomy and acknowledged before Levi. Several trips to Levi's office were made by defendant. On May 22, 1941, defendant took plaintiff to Ruth Henschen, where plaintiff signed the deed from her to him and Miss Henschen notarized it. These deeds were for a time kept by plaintiff and later on she gave them to him. When he learned of plaintiff's marriage in July of 1948, he filed the deed from plaintiff to him for record on August 6, 1948. Plaintiff never repaid him for any taxes or other expenditures made by him on the property. No alteration was ever made in the deed by defendant.

Defendant denied he ever had sexual intercourse with plaintiff. Attempts to do so were made, but he was physically unable to consummate the act because of loss of manhood. During their association both he and plaintiff bought bonds which were put in their joint names.

The trial judge then asked defendant whether the notary public gave plaintiff a pen to sign her name when the acknowledgment was taken. Defendant stated he did not know, that the pen must have been "right there". The judge then asked

defendant whether plaintiff's signature and the notary's signature were written by the same pen. Defendant answered that he could not tell, but both signatures were affixed at the same time.

The relief sought by plaintiff invokes the most extraordinary power of a court of equity and is to be exercised only upon strong, cogent and convincing evidence. Hedrick v. Hedrick, 350 Mo. 716, 168 S.W.2d 69, 74; Dreckshage v. Dreckshage, 352 Mo. 78, 176 S.W.2d 7, 14; Tweed v. Timmons, Mo.Sup., 253 S.W.2d 176, 178. Upon appeal, we review the entire record de novo and reach our own conclusions as to the weight and value of the evidence, giving deference to the findings of the chancellor who saw and heard the witnesses. But the rule of deference does not relieve us of the duty to weigh the evidence, reach our own conclusions, and, if upon review of the whole record, we conclude that the evidence does not meet the standard required, we must so say. Edinger v. Kratzer, Mo.Sup., 175 S.W.2d 807, 813; Ash Grove Lime & Portland Cement Co. v. White, 361 Mo. 1111, 238 S.W.2d 368, 370.

We are convinced that the finding and decree of the trial court is against the weight of the credible evidence in this case. The admitted facts and circumstances in evidence, the oral testimony of the disinterested witnesses and, above all, the written instruments solemnly executed contemporaneously with and in consummation of the transfers here under scrutiny, can lead to no other sustainable conclusion.

The understanding of plaintiff and defendant with reference to ultimately entering into marriage, their relations from 1938 until 1947 and plaintiff's knowledge or lack of knowledge of defendant's marital status are important only insofar as they may shed light upon the determinative issue herein, to wit: Did plaintiff execute the deed to defendant, and was it her free act and deed?

As to plaintiff's knowledge of defendant's marital status: It is significant that she associated with him for nine years, during the last seven years of which, she testified, defendant, although repeatedly promising to marry her, continued to "put her off" with excuses, yet not a single one of which does she relate into the evidence. Furthermore, plaintiff's mother, at first disclaiming knowledge of defendant's marital status during his association with plaintiff, finally admitted that as early as 1944 she learned he was married and that she thereafter told plaintiff. Her testimony, coupled with the testimony of disinterested relatives that defendant's marital status was common knowledge within the family, and the fact that in 1941 defendant openly filed and went into trial of a divorce action against his wife in the City of St. Louis, tend strongly to refute plaintiff's testimony on that phase of the case.

As to the deed from Mrs. DeNomy to plaintiff: Only plaintiff testified that Mrs. DeNomy intended the property to be deeded to plaintiff to "keep it in the family". Mrs. Hauschild was sympathetic to that version, but she testified, "He (defendant) was supposed to take it over and save it, in order that the daughter would get it." It may be that both plaintiff and her mother, and possibly Mrs. DeNomy, believed that at some future date plaintiff and defendant could and would marry, in which event the property would become their home. But the evidence is well nigh conclusive that Mrs. DeNomy did know full well, and intend, that the property was to be deeded to defendant, as she solemnly agreed to do in the earnest money contract.

As to the deed from plaintiff to defendant: Defendant's testimony that he caused the deed from Mrs. DeNomy to be made to plaintiff is entirely plausible. Obviously, he could not dispose of or encumber the property without intervention of court so long as he remained married and his wife remained insane. Regardless of the morals involved, the practice of placing record title to real property in similar situations in a single straw party and taking a conveyance back (which is not recorded) is not unknown.

It is true that plaintiff testified unequivocally that she never signed or acknowl-

edged any deed, was never at Miss Henschen's office, and did not know of the deed's existence until 1949, but, even though repetitious, we again state, in substance, the allegations of the petition: (1) She denies execution of the deed; (2) that if she did sign it, it was represented to her to be an application for a driver's license; and (3) that she has since learned defendant tricked *her into signing it* so that if she ever married, he would have her at his mercy. The finding of the trial court is ambiguous. It may be construed to mean that she never signed any deed or that the instrument in evidence is different from the deed she actually signed, in that the signature has been altered.

There is no evidence that plaintiff signed any deed thinking it was a driver's license or that any deed was obtained from her for the purpose of placing her at defendant's mercy if she subsequently married another, or by reason of any other trick, fraud or deceit practiced upon her. Therefore, the only issue for determination is whether plaintiff signed, acknowledged and delivered the deed. If she did, then title vested in defendant, and an alteration, writing over, mutilation or changing of her signature (and that is the only alteration suggested; none is pleaded) would not in the least affect the title.

That a woman accompanied by defendant appeared at the office of Miss Henschen on May 22, 1941, and signed and acknowledged the deed in question is admitted. It is difficult to believe that at that time, when plaintiff's and defendant's relations were cordial, to say the least of them, defendant would resort to such a desperate scheme to obtain the title to the property. The two admitted signatures of plaintiff shown above, and especially the one written in 1942, bear a striking resemblance to the signature on the deed. A close inspection of the signature on the deed shows that the word "Lorraine" was written as a part of the signature with a pen or pencil and that thereafter it was erased and the same word was again written over the erasure. No contention is made that the word "Lorraine" is written with a pen or ink differ-

ent from that used in writing the word "Hauschild". The trial court determined that the notary's signature and the grantor's signature were written with different ink, but we do not attach any significance to that fact; frequently that is done. Neither do we attach any significance to the fact that the second upward stroke in the "u" in the word "Hauschild" is not made; similar inadvertent omissions are made by many of us. But, most persuasive of the conclusion that plaintiff signed the deed is the fact that when Mr. and Mrs. Hauschild and plaintiff moved into the property in 1944 the Hauschilds, on demand of defendant, paid rent for about three years thereafter and only stopped paying it when Mr. Hauschild became ill and defendant forgave the rent. During this three year period, the rent was paid monthly and, although paid to plaintiff, defendant gave the receipts therefor. This was a clear recognition of defendant's ownership of the property. These facts, buttressed by the definite admission in the petition that plaintiff signed the deed, convince us she did freely and voluntarily sign and deliver it.

The judgment is reversed.

All concur.