**Theodore M. HOUGHTON, Respondent,**

v.

**Alta WEST, Appellant.**

No. 45493.

Supreme Court of Missouri, Division No. 2.

Sept. 9, 1957.

Motion for Rehearing or for Transfer to Court En Banc Denied Oct. 14, 1957.

Charles A. Powell, Jr., Macon, for appellant.

Harry L. Porter, Marceline, for respondent.

BOHLING, Commissioner.

Theodore M. Houghton, grantor, instituted this suit on December 10, 1954, to cancel his warranty deed to "Dr. C. O. West and Alta West, husband and wife," grantees, on the grounds of mental incapacity and undue influence. On January 23, 1955, Dr. West died, and plaintiff filed an amended petition naming Alta West as sole defendant. The chancellor found the issues in favor of plaintiff on each of the pleaded grounds. Defendant has appealed, and questions the correctness of the findings.

*Plaintiff's evidence:* Plaintiff was 82 years old when the deed was executed on December 19, 1953. It was filed for record May 24, 1954. It conveyed, reserving a life estate, grantor's 400 acre farm, located about four miles out of New Cambria, Macon County, Missouri, to said grantee for the recited consideration of "One Dollar and other valuable consideration"; and contained the following covenant:

"This conveyance is made to Dr. C. O. West and Alta West, husband and wife, with full power of disposal, but said land or the proceeds of sale thereof are to be used for the establishment, erection, improvement and maintenance of the West Memorial Museum of New Cambria, Missouri, a museum dedicated to educational, historical, scientific and benevolent purposes."

Defendant objected to plaintiff's competency to testify respecting the transaction by reason of the death of Dr. C. O. West and, plaintiff's counsel conceding the point, he was excused.

Mrs. West, called to the stand by plaintiff, testified she knew of no money or other consideration passing to plaintiff for the deed, and she was not contending her husband bought the land from plaintiff.

Jack Rector started working for plaintiff in 1949, doing carpentry, painting and repair work. Plaintiff made his home with Mr. and Mrs. Rector in New Cambria after February, 1952. Later, Rector looked after plaintiff's farm and business affairs, particularly while plaintiff was in the hospital. After December, 1952, they had a written agreement covering Rector's services.

On December 7, 1953, plaintiff became very ill and was taken to the St. Francis Hospital in Marceline. He was still there at the time of trial, November, 1955. Rector visited plaintiff between 2 and 4 p.m. at least twice a week and, so far as material here, on December 7, 9, 12, 16, 19, and 22. Rector testified that plaintiff was so weak he stayed in bed and witness would shave him; that on December 12th plaintiff told him: " 'My head is this big', and I said 'Oh, Theodore, your head couldn't be that big.' He said, 'Feel my head' "; and that on December 19th when he went in the room plaintiff asked: " 'How did you find me here? I didn't know I was over here.' I said 'Why, Theodore, I brought you over here.' He said, 'No you didn't. I walked over here.' "

He testified Dr. West accompanied him on practically all his trips to the hospital and on December 19th, Dr. West bent over plaintiff's bed and said: " 'I can't even hear what he is saying.' He said, 'He'll be dead before next Saturday.' "; and on the trip on December 22nd told him: " 'Just sit steady until the fog settles and you'll get yours.' " Witness told him he did not know what he meant and " 'I'll tell you how long I'll sit steady, until you quit fooling with Theodore.' " He saw Dr. West frequently after December 22nd but Dr. West never mentioned that plaintiff had made a deed to him.

Mrs. Rector accompanied her husband to the hospital and stated that plaintiff's voice was weak, she could not understand him, and on one occasion Dr. West, after leaning over plaintiff's bed, said " 'I can't understand him' "; that plaintiff appeared to be asleep most of the time, and, on

cross-examination, that plaintiff did not know her every time she was there.

Harry Dowell had known plaintiff since 1908. He visited plaintiff between December 15th and 18th. Plaintiff "didn't seem to know" him until told who he was. Plaintiff seemed to be weak and he had difficulty understanding plaintiff.

William Peterson had known plaintiff for twenty years. When he visited plaintiff on December 20th, plaintiff said: " 'I don't know who you are.' " Witness told him and plaintiff said: " 'Sure.' " " 'Well, I have had so many shots I don't know what I'm doing.' "

Virgil Houghton was a grand nephew of plaintiff. He testified he farmed plaintiff's land in 1953, and in November had a verbal understanding to farm it the next year. He and his wife took plaintiff some things the night of December 12th, it being plaintiff's birthday. He asked plaintiff about plowing some land and plaintiff told him to go ahead. He plowed some land that had not been plowed for forty years but stopped when Mr. Rector questioned him about it and said he would see plaintiff. He and his wife went to see plaintiff about the plowing on the night of December 20th, and plaintiff, according to Mr. Houghton, acted like he did not want to talk, kept shaking his head and hands, and witness finally understood he had rented the ground to the Stoddard brothers. Mrs. Houghton testified that on December 12th, plaintiff was weak and complained of his head hurting; that on the 20th plaintiff was "awful nervous and shaky," was weak, had to be helped, wasn't able to hold his head up, and that they finally understood he had rented the corn ground to the Stoddards, plaintiff saying, " 'I had to turn it over to them.' " Asked on cross-examination whether her husband said anything to plaintiff upon understanding plaintiff had rented to the Stoddards, Mrs. Houghton answered: "No, because we didn't know whether he knew what he was talking about."

"Q. You didn't argue with him? A. No, didn't argue. He wasn't in shape to hardly talk much less quarrel."

William Houghton, plaintiff's nephew, visited plaintiff on the afternoon of the 20th. Plaintiff was asleep, but awakened in about thirty minutes, and, in answer to a question, told him he was "awful sick." Plaintiff was pale and nervous, talked like his tongue was thick, was inclined to sleep, and soon went back to sleep.

Chris Kornburst testified that he had been an employee of the St. Francis Hospital since 1946, and frequently helped care for patients, including plaintiff; that plaintiff was a bed-patient in December, 1953, was so weak he had to be helped to turn in bed and some one had to feed him; and that this condition continued through December, 1953, and part of January, 1954. Witness talked very little with plaintiff as plaintiff did not have much to say.

Dr. Robert W. Smith was Chief of Staff at St. Francis Hospital in Marceline. He testified that Dr. West often referred patients to him; that Dr. West brought plaintiff to the hospital and referred plaintiff to him; and that plaintiff was hospitalized the second time in December, 1952, and again in February, June, August and December, 1953. Dr. Smith had the responsibility of plaintiff's treatment in the hospital, but plaintiff was considered Dr. West's patient. Mr. Rector also testified that Dr. West treated plaintiff and was plaintiff's doctor.

Dr. Smith testified that on December 7, 1953, plaintiff had diabetes, considerable arteriosclerosis or hardening of the arteries, with encephalomalacia or softening of the brain, and perhaps, but not determined, carcinoma of the esophagus. Plaintiff was senile and his brain had been damaged by arteriosclerosis and worsened by uncontrolled diabetes. Plaintiff was undernourished, due to improper nutrition, attributed to his getting too much insulin and not to insufficient food. Plaintiff had permitted his diabetes to get out of control, which caused him to be very weak, feel bad and complain of pain. Plaintiff was given insulin, phenaphen, and some codeine during December, 1953. Plaintiff was placed on a diet and every day or two the insulin and his blood sugar were checked to balance the two. Dr. Smith stated there was no material change in plaintiff's condition during December, 1953, and although his diabetes might have been under a little better control, it was not adequately controlled until January, 1954. Plaintiff's arteriosclerosis, which is progressive, had not improved up to the time of trial, November, 1955, but his physical condition had improved.

Dr. Smith stated persons in plaintiff's situation "understand a little bit more" at times than at other times; that although it was possible for plaintiff to have a lucid period on December 19th, he did not have a definite recollection of plaintiff's condition on that day; that at that time one day was just like another for plaintiff; that the physical condition has a lot to do with it, and plaintiff's physical condition was practically the same for a month or six weeks after December 7, 1953.

Dr. Smith stated he made the rounds at the hospital and saw plaintiff at least once, possibly twice a day, and if he didn't see plaintiff, his associate did. Asked his opinion of plaintiff's ability to carry on ordinary business affairs in December, 1953, he answered: "I feel that Mr. Houghton was not capable of transacting business in the usual manner. I still think he isn't capable of transacting business." And, on cross-examination: "Well I think he was incapable of carrying on his normal activities so far as knowing what was to be done on the farm, or was being done on the farm, or whether he should sell a cow or buy one, that sort of thing. I don't believe he knew whether he wanted to sell or wanted to buy." Asked about his authorizing Virgil Houghton to plow, Dr. Smith answered: "Well I still say I don't feel that he was really able to issue orders because I don't believe he knew. I am sure

[if] someone asked him if he should plow I expect he would tell them to go ahead and plow." Plaintiff "would presume he knew whether he had any business doing it or not."

*Defendant's evidence:* R. Wilson Barrow, an attorney of Macon, testified to the following effect: He had represented plaintiff. He also had represented Dr. West. Someone, he did not know who, could have been Dr. West but his memory is it was a woman, telephoned him that plaintiff wanted to see him. He saw plaintiff in the hospital on two different days prior to December 19, 1953. He had written a will for plaintiff in 1950 in which plaintiff gave Dr. West his antiques, Dr. West's daughter, Emma, a $2,500 insurance policy, and named a cemetery and a school district as beneficiaries. Plaintiff first talked about changes in his will. Plaintiff told him: "You can deed or will the farm. I would rather deed it just so I have it as long as I live, because I have no relatives to whom I want to leave any property." Plaintiff said his relatives didn't care anything about him; and that he had felt kindly toward Virgil Houghton until he plowed some sod on the farm. Plaintiff wanted to make the same provision for Emma West as in the first will, and make the residuary clause to Dr. and Mrs. West for the purpose of the West Memorial Museum and nominate Dr. West as executor and Mrs. West as his successor. Plaintiff said "he wanted to deed this property to Dr. West for them to use for his West Memorial Museum." On December 19th he took the will and deed to plaintiff. Mr. Harley Trader, President of the Marceline State Bank, and Mrs. Mary Ridgeway, in charge of the office at the hospital, and witness were present when plaintiff executed the papers in his room at the hospital. Witness read the deed and the will to plaintiff before the others arrived, and again after they were present. Plaintiff said everything was the way he wanted it, and executed the papers. Plaintiff was sitting in bed. Plaintiff knew him and spoke to him. Plaintiff's voice was not strong. The only thing he saw wrong with plaintiff was his fingers were stiff with arthritis and he had trouble taking hold of the pen. Plaintiff gave witness the will to keep and said he would give the deed to Dr. West. Dr. West showed witness the deed the following Spring.

From the testimony of Mr. Barrow plaintiff had knowledge and understanding of the nature and extent of his property and the objects of his bounty. Mr. Barrow stated plaintiff certainly was competent to transact business.

Harley E. Trader testified someone telephoned to him early Saturday morning, December 19th, to take an acknowledgment at the hospital. He thought Dr. West called him, but stated he did not know. Asked to state who were in plaintiff's room at the time, witness answered: "I think Mr. Barrow. I am pretty sure he was there and Dr. West and the man that signed the deed." He also testified that plaintiff was in poor health; that he had known Dr. and Mrs. West for thirty years and they were friends when he lived in New Cambria; that, aside from plaintiff acknowledging the execution of the deed, witness did not have any idea whether plaintiff knew what was in the deed; and that he did not know whether plaintiff was mentally competent or not.

Mrs. Mary Ridgeway did not testify.

Defendant adduced evidence of Dr. West's good reputation.

 We have the duty to review the case de novo, weigh the evidence and reach our own conclusions. Miller v. Minstermann, Mo., 266 S.W.2d 672, 679; Edinger v. Kratzer, Mo., 175 S.W.2d 807, 813. The cancellation of a deed by a court of equity requires clear, cogent and convincing evidence. Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 67; Hedrick v. Hedrick, 350 Mo. 716, 168 S.W.2d 69, 74; Miller v. Minstermann, supra. Appellate courts give due deference to the findings of the chan-

cellor resting upon conflicting oral evidence, except where convinced that the findings are against the weight of the evidence. Benn v. Jolly, Mo., 247 S.W.2d 840, 853 [1]; Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620, 621 [3]; Morris v. Morris, Mo., 4 S.W.2d 459, 461 [1].

The oral testimony on plaintiff's mental competency was conflicting. Defendant's witness Barrow's testimony established plaintiff's competency. On the other hand Dr. Smith's testimony established that in addition to the senility of one of the age of 82, plaintiff's mental deterioration had been aggravated by the hardening of plaintiff's arteries, the softening of his brain, and his permitting his diabetes to get out of control. He gave his opinion, stating his reasons, that plaintiff was mentally incompetent to transact business. The testimony of plaintiff's lay witnesses tended to corroborate Dr. Smith's testimony. Mr. Trader, defendant's witness, stated he did not know whether plaintiff was mentally competent. The chancellor found that plaintiff was mentally incompetent.

■ " 'Undue influence' is such influence over the grantor as in law is considered to be force, coercion or over-persuasion and which destroys the will power or free agency to act of the grantor." McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 706 [13]; Clark v. Leonard, Mo., 232 S.W.2d 474, 478 [2]; Been v. Jolly, Mo., 247 S.W. 2d 840, 853 [3].

■ Undue influence is not proclaimed but, like fraud, is concealed. Coldwell v. Coldwell, Mo., 228 S.W. 95, 102 [1–3]; Shafer v. Hatfield, 359 Mo. 673, 223 S.W.2d 396, 401 [3]. Undue influence and its connection with a deed or will often may be shown only by circumstantial evidence, and it is not necessary to show overt acts of undue influence at the very time the instrument was executed. Dimity v. Dimity, Mo., 62 S.W.2d 859, 863 [6]; Coldwell v. Coldwell, supra; Gott v. Dennis, 296 Mo. 66, 246 S.W. 218, 222 [1–4]; Hammonds v. Hammonds, Mo., 297 S.W.2d 391, 395

[5]; Meier v. Buchter, 197 Mo. 68, 91, 94 S.W. 883, 889, 6 L.R.A.,N.S., 202, 7 Ann. Cas. 887; Herrold v. Hart, Mo., 290 S.W.2d 49, 56.

■ In addition to the existence of a fiduciary relation to raise a presumption of undue influence there must exist evidence from which it can be inferred that the fiduciary-beneficiary "had been active in some way which caused or assisted in causing the execution of the" instrument. Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772, 777; Baker v. Spears, 357 Mo. 601, 210 S.W.2d 13, 17.

Plaintiff adduced testimony that Dr. West was plaintiff's physician, establishing a confidential relationship. Been v. Jolly, Mo., 247 S.W.2d 840, 853, 854; 70 C.J.S. Physicians and Surgeons § 36, p. 941; 41 Am.Jur. 196, § 74. Dr. West accompanied Mr. Rector on practically all of Rector's trips to see plaintiff at the hospital. On December 19th, the day the deed was executed, Dr. West stated he could not understand what plaintiff was saying and that plaintiff would be dead by the following Saturday. Mr. Trader, the President of the Marceline State Bank and defendant's witness, testified Dr. West was present when plaintiff's acknowledgment was taken, although the scrivener's testimony was that Dr. West was not present. There was no consideration for the deed. The deed was not a direct gift from the grantor to the grantees. The covenant for the use of the West Memorial Museum affords some indication the transaction had been discussed. On December 22nd Dr. West told Rector: "Just sit steady until the fog settles and you'll get yours." Dr. West never mentioned to Rector that plaintiff had made a deed to him. The deed was not recorded until May 24, 1954.

■ The instant issue is somewhat like Holland v. Anderson, Mo., 196 S.W.2d 175, 192, wherein a deed of an eighty-two year old grantor was set aside. We there said: " * * * we think no one can read the record without concluding that the de-

ceased's [grantor's] ability to remember, grasp and coordinate facts had been considerably impaired. And while it is legally possible for undue influence to be exerted on one of sound mind, yet where mental weakness exists it is an important factor to be considered." Shafer v. Hatfield, 359 Mo. 673, 223 S.W.2d 396, 401 [3–5]; Colquitt v. Lowe, Mo., 184 S.W.2d 420, 423 [1–3, 6, 7]; Morris v. Morris, Mo., 4 S.W.2d 459, 463 [4]; 26 C.J.S. Deeds § 62, b, p. 768; 16 Am.Jur. 461, § 39. The instant plaintiff's evidence clearly established great weakness of mind, and the chancellor could find that defendant failed to discharge the burden of going forward with evidence disproving the inference of undue influence.

Upon a study of the whole record we are not disposed to overturn the findings of the chancellor.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.