Madalyn Brewer SULLIVAN and Mary Jane Brewer, Appellants,

v.

John W. WINER, Respondent.

No. 46317.

Supreme Court of Missouri,
Division No. 1.

March 10, 1958.

J. O. Swink, Farmington, for appellants.

W. Thomas Coghill, Jr., St. Louis, for respondent Winer.

HYDE, Judge.

Action to set aside deed to land in St. Francois County on grounds of mental incapacity and undue influence. The Court found the deed valid and entered judgment for defendant and plaintiffs have appealed.

The deed sought to be set aside was made by Josie Brewer Winer to defendant, her second husband, on October 10, 1955. Mrs. Winer died on January 13, 1956, at the age of 68; defendant was 77 at the time of the trial. Plaintiffs are Mrs. Winer's daughter by her first marriage and her granddaughter, the daughter of her deceased son. Since only her daughter Madalyn Brewer Sullivan testified at the trial, she will be referred to as plaintiff. Mrs. Winer had several cerebral hemorrhages in 1954, being in the hospital at Ironton from March 6th to April 19th; in the hospital at Bonne Terre from July 9th to July 19th and in St. Luke's Hospital at St. Louis from July 19th to August 17th. Dr. J. C. Edwards of St. Luke's was a witness for plaintiff and said his diagnoses were subarachnoid hemorrhage due to vascular disease with hypertension, pseudo zanthoma elasticum (appearance of the skin due to degenerative changes), multiple cerebral thrombosis, aneurysm (enlargement) of the innominate artery (right side of neck), aneurysm of the abdominal aorta and generalized arteriosclerosis. He said she had a very severe hypertension which temporarily affected her eyes and this had caused several "small strokes." Dr. Edwards said that by proper medication he was able to control her blood pressure to much less dangerous levels. He referred her back to Dr. C. E. Carleton at Farmington for care and gave her a diet to follow.

Dr. Edwards said Mrs. Winer was not insane. As to her condition he said: "It fluctuated from a confused state to a state of being oriented and recognizing people about her to certain times when she would feel dizzy, have headaches, and as she did on August 6th, 1954, talking incoherently * * *. At other times she would know what she was saying and would recognize people and be able to converse. * * * She had improved at the time of her discharge." He also said: "It would be difficult to state, if not impossible to state that she would remain clear throughout the rest of her life * * * but it would be unusual for a person, I would say, in her condition to not at some time before her demise lose considerable of her faculties or her ordinary normal status. * * * I am not stating that she would never be able to at any certain time (retain enough mental capacity to make business decisions); that could only be done if one examined her at the time the decision in question was under controversy." He further said: "She had a very severe hypertension or high pressure, which we referred to as malignant high blood pressure, or hypertension, which simply means the severe form of high blood pressure. * * * It has nothing to do with malignancy as far as cancer."

Plaintiff went to live with her mother and defendant, after her discharge from St. Luke's, on the farm which was later conveyed to defendant by the deed sought to be set aside. Plaintiff's two minor sons had been staying there previously and continued to stay there. Plaintiff was trained as a practical nurse and had also been teaching as a substitute teacher in the St. Louis schools. She left this employment to take care of her mother and did so until Octo-

ber 1955 when defendant and Mrs. Winer left the farm and moved to Doe Run, after the deed in question was made. She said she prepared her mother's meals, gave her medicine, did her laundry and provided her general nursing care. Plaintiff said her mother grew worse soon after returning from St. Louis, did not play cards or read books and magazines as before, not being able to remember the cards played or what she had read, would forget she had seen persons and relatives who visited her, confused plaintiff's son, her grandson, with her son who had died about 18 years previously, and wasn't as friendly and talkative as she had always been. However, plaintiff said her mother could walk without assistance, always recognized her and knew that she owned the farm and other real estate she had in St. Francois County and in Texas. Plaintiff also said she talked to Dr. Carleton, Mrs. Winer's local physician, prior to the execution of the deed and that he advised her to have a psychiatrist see her mother and said he realized she had a problem with her mother. Defendant and Mrs. Winer had a joint bank account from which all bills were paid and plaintiff said life insurance proceeds of $10,000 on Mrs. Winer's first husband, plaintiff's father, went into that account. He had died prior to 1938 when plaintiff's mother married defendant, who had not been previously married. (Defendant said the amount was $2,000 and that Mrs. Winer had a separate account for the first four or five years of their marriage.) Plaintiff's attorney testified that Mrs. Winer did not recognize him in September 1955, when he took her affidavit concerning the heirs of her first husband, in connection with a real estate transaction, although she had been acquainted with him since 1929.

Dr. James F. McFadden, a physician and neuro-psychiatrist on the staff of State Hospital No. 4 for the insane at Farmington, also testified as a witness for plaintiff. He had never seen Mrs. Winer but gave his opinion based on a hypothetical question that she was not mentally competent to manage her own affairs and was legally insane in October 1955. He said he based his opinion entirely on plaintiff's testimony and that her testimony concerning the change as to card playing and reading by Mrs. Winer clinched his diagnosis. He also testified: "Q. What is the difference in malignant hypertension and ordinary hypertension? A. Well, malignant hypertension, is a hypertension that is going to cause death in a short while, and it is rapid and not cureable, and is not responsive favorably to treatment. Q. Not all people that are afflicted with hypertension are affected mentally, are they? A. No, they are not. Q. One more question, you stated that malignant hypertension will not respond to medication? A. It may improve a little bit but in general, the general condition is hopeless."

Defendant's witness Dr. Carleton, who was Mrs. Winer's doctor before she went to St. Luke's, and after she returned, said he saw her every two weeks for the first three months and then once a month thereafter. He saw her in September 1955 (12 days before the deed was executed) and in October (18 days after its execution) and found her blood pressure to be 180/100 in September and 170/80 in October, which Dr. Edwards had said would be a satisfactory level and which Dr. McFadden said he would not worry about. He felt she was mentally clear on both occasions. Dr. Carleton said he did not feel she had malignant hypertension because it was fairly adequately controlled by medication. He said she had a mild stroke prior to going to the hospital in St. Louis, and that he thought her thrombosis at that time was very moderate, small intercerebral hemorrhages. Dr. Carleton said he felt she was mentally competent, "capable of making decisions on her own and being aware of what decisions she was making." He said in the fall of 1955 plaintiff came to his office and talked to him with regard to her mother's mental capacity and he told her he felt that her mother was mentally competent, although she did show signs of senility and "had a

degenerative change of blood vessels, including the brain, of moderate to severe nature." He said he told plaintiff "that it was my feeling that her mother was mentally competent and in order for me to say she was unaware of what she had done, we would have to say that her mother was mentally incompetent and be judged insane, and I could not say that from my observation". His opinion was that her condition remained fairly stationary, unchanged between August 1954 and the time of her death.

Defendant also had evidence of relatives, friends and visitors of Mrs. Winer concerning her condition, including her sister, sisters-in-law, niece and nephews, all of whom testified she recognized them, asked about their families, and seemed mentally unimpaired. Their testimony was that she was clean and neat, required no assistance in walking or dressing and continued to read papers and magazines. In December 1955, after the deed was made, Mrs. Winer (with defendant) visited her sister in Bonne Terre for a week, including Christmas, and several of her relatives who testified saw her and visited with her at that time. They said she showed no mental weakness, was up and around, walking without assistance and they saw no difference in her appearance or actions. At that time, Mrs. Winer said her married years with defendant were the happiest time of her life. Mrs. Winer's sister visited her almost every week during 1955, never saw her when she appeared to be confused and said she was always particular about her appearance. She said Mrs. Winer told her, after moving from the farm to Doe Run, that she had made a joint deed to the farm to protect defendant; that the Sullivans did not want them to sell the farm and that they were angry because defendant sold his horses and tractor. (Plaintiff would not sign a deed to the Texas property after a sale had been negotiated.) Defendant said he had made improvements on the farm, putting in a basement and a cistern, for which he paid, and had paid the taxes.

Defendant's evidence concerning making the deed was that Mrs. Winer telephoned T. A. Matthews on October 9, 1955, and asked him to come out the next day to prepare some papers for her. She had known him since 1925 when he was Prosecuting Attorney and her first husband was County Collector, and he had written her will in 1950. He told her he had an appointment with persons coming from St. Louis, and suggested she go to the office of Mr. Milton Schnebelen which was on the first floor (Matthews' office was on the second floor) so she would not have to come up steps. The next day defendant came to Schnebelen's office and asked if he would prepare a deed for Mrs. Winer. When he said he would, defendant said she was in the car and went to get her. She walked in without assistance. He said: "Mr. Winer asked me to make a deed putting the property in both names. At the same time I then asked Mrs. Winer if this was what she wanted. 'Yes', that was her reply. * * After I had finished typing the deed * * I asked Mrs. Winer if this was what she wanted, and she said 'this is absolutely what I want', and I said 'do you know that you are creating a tenancy by the entirety wherein the survivor takes all of the property', and she said 'yes, that is what I want'. * * * She signed the deed with what I would say was a firm hand." Mrs. Schnebelen, who was also an attorney and a notary, was present and took the acknowledgment of Mrs. Winer. She had known Mrs. Winer for sometime and they had a general conversation. She said she did not have any question about her mental competency. Plaintiff's attorney called her, after plaintiff had contacted him about stopping the transaction that day and told her not to prepare any instrument for Mrs. Winer. Mrs. Schnebelen told him " 'It is too late', and he let me know he did not feel Mrs. Winer was competent, and I told him in return I felt that she was just as sane as he or I."

Mr. Matthews said he was called a week later to come out and look over the deed

Schnebelen had prepared. He said, after Mrs. Winer asked him about certain members of his family, "she handed the deed over to me, and after I received it, she said 'Madalyn tells me the deed isn't worth the paper it is written on and that it should be conveyed to a straw party and then conveyed back to Mr. Winer and me, and that she was going to sue us', and well, I looked at that deed \* \* \* I says, 'Mrs. Winer, I can't see anything wrong with this deed and I think it is all right under that new Statute where you convey to John Winer and yourself.' \* \* \* She said, 'Mr. Matthews, you know you wrote my Will \* \* \* Will this Will in anywise change this deed.' \* \* \* I said 'this deed, as I see it, would take the place of that Will with regard to the real estate designated'. \* \* \* I told her that it created an estate by the entirety, and that if one passed away the other would take it absolutely, and she said, 'that is the way I want it.' " Because of the controversy over this deed, defendant and Mrs. Winer left the farm and went to the home of Mr. and Mrs. William Abernathy in Doe Run soon after the deed was executed and stayed there until Mrs. Winer died in January 1956.

On January 5, 1956, Mrs. Winer and defendant went to Schnebelen's office to sign a contract for sale of the farm for $15,000, settlement to be made on March 15th. Mr. Winer had asked Matthews to handle the matter and he had Schnebelen write the contract. Matthews there explained the contract to Mrs. Winer. She said they needed the money to pay medical bills and told him she bought the place about 20 years ago, paying $1,000 for it with a mortgage of about $3,000 on it. Before the contract was signed the prospective purchaser came to see Mrs. Winer at Abernathys and said: "Madalyn tells me today that Mr. Winer had no authority to sell this farm, and if I buy it that I am buying a lawsuit. And I want to know did Uncle John pay the mortgage off on this farm, or who and Mrs. Winer said 'well, he paid some money on the farm' ". Abernathy had rented the farm (except the buildings) for several years, farming it on the basis of ⅓ of everything he raised for rent; and had it rented for 1956 when the contract of sale was made. Reference will hereinafter be made to other facts.

■■ As plaintiff says it is our duty to review this case de novo, make our own independent finding of facts and reach our own conclusion as to where the weight of the evidence lies, giving due regard to the trial court's opportunity to judge the credibility of the witness. Faire v. Burke, 363 Mo. 562, 252 S.W.2d 289; Miller v. Minstermann, Mo.Sup., 266 S.W.2d 672; Houghton v. West, Mo.Sup., 305 S.W.2d 407. On the issue of mental capacity, the only doctor, who saw and treated Mrs. Winer, called as a witness by plaintiff, Dr. Edwards, would not say she did not retain enough mental capacity to make business decisions and did say she was not insane. The view of his testimony most favorable to plaintiff is that at times she would be confused, disoriented and incoherent and at other times be oriented, able to recognize and converse with people and make business decisions. "Where as here, it is sought to set aside a voluntary deed because grantor lacked the mental capacity to execute a valid instrument of conveyance to his property, the burden is upon those who seek to have it set aside to establish that at the time of its execution grantor lacked such mental capacity." McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 703, and cases cited. While the testimony of Dr. McFadden (plaintiff's other medical witness) was to the effect that Mrs. Winer was incompetent at the time the deed was made, he had never seen her and his opinion was based on the testimony of plaintiff which was contradicted by many other witnesses who appeared and testified orally before the Chancellor. Furthermore, defendant's witness Dr. Carleton, who attended Mrs. Winer regularly (1954–1956) was positive that she was mentally competent. It is true that Mrs. Abernathy said that when the Winers first came to stay at the Abernathy home, Mrs. Winer

922

"was very confused about something" and "would cry quite a bit." However, Mrs. Abernathy also said: "I don't know that she was confused, but she did cry and I wouldn't know what she was crying about." However, there had been a quarrel or at least controversy with plaintiff over the deed and the Winers had moved out because of it. (Defendant's evidence was that plaintiff cursed her mother although plaintiff denied it.) However, the testimony of Mrs. Abernathy as a whole, showed that Mrs. Winer kept herself neat and clean, walked without assistance, read the papers and worked crossword puzzles. (Defendant said Mrs. Winer was reading the paper when she had the last attack from which she died.) The testimony of Mr. Matthews and the Schnebelens about the deed transaction and the testimony of Mrs. Winer's relatives about her Christmas visit to Bonne Terre, which must have been believed by the Chancellor, was strong evidence of her mental competency in the fall of 1955. We think the weight of the evidence supports his finding of mental competency of Mrs. Winer at the time the deed was executed and so find.

■■ On the issue of undue influence plaintiff relies on mental weakness of Mrs. Winer, the opportunity of defendant to exercise such influence, the fact that it would have been to his advantage to do so, and the fact that he was acting in a fiduciary capacity, renting her farm, collecting the rent, keeping everything in a joint bank account on which he wrote the checks during her last two years. Plaintiff had no direct evidence of exercise of undue influence by defendant and this case is unusual in that plaintiff was living in the house with the Winers and exercising influence against making the deed (with the help of her husband), even to the point of employing an attorney two weeks before it was made, to try to prevent it. However, "a presumption of undue influence does not arise from confidential relationship alone." McCoy v. McCoy, supra, 227 S.W.2d loc. cit. 705 and

cases cited; see also Walton v. Van Camp, Mo.Sup., 283 S.W.2d 493, 501 and cases cited. There must be both confidential relationship and other facts and circumstances tending to show undue influence such as unusual activity in the preparation of a will or deed by one who profited by it over others for whom equal regard had been expressed by the maker, executing it without the advice of a wholly disinterested person and concealment of the transaction by the one who profited by it. Bohnsack v. Hanebrink, Mo.Sup., 240 S.W.2d 903; Machens v. Machens, Mo.Sup., 263 S.W.2d 724. Defendant's evidence showed that the first action toward making the deed was taken by Mrs. Winer when she telephoned Mr. Matthews (who had made her will) and asked him to come out to the farm to prepare it. According to his testimony, it was at his suggestion that Mrs. Winer went to the Schnebelens to get it done, and it was she who called him to come out and see the deed and advise her about it, after it had been executed. Thus there was no such activity by defendant in procuring the deed as in Manahan v. Manahan, Mo.Sup., 52 S.W.2d 825; Holland v. Anderson, Mo.Sup., 196 S.W.2d 175; Peine v. Sater, Mo.Sup., 289 S.W.2d 101, relied on by plaintiff. Furthermore, in those cases and Houghton v. West, Mo.Sup., 305 S.W.2d 407, also relied on by plaintiff, the trial court found in favor of the plaintiffs and we affirmed the decree. In Snell v. Seek, 363 Mo. 225, 250 S.W.2d 336, 345, we held activities of a husband in connection with the execution of a will (greater than shown herein) "did not constitute such facts and circumstances which would support a reasonable inference of, or raise a presumption of undue influence" because they "amounted to nothing more than physical assistance rendered by a husband to a wife under the exigencies of the situation." The weight of the evidence herein seems to sustain a finding that Mrs. Winer knew what she was doing, wanted to make the conveyance she did and that the conveyance was not the result of undue

influence. We, therefore, sustain the findings of the Chancellor.

The judgment is affirmed.

All concur.