Wilbur H. GRUETZMACHER, Plaintiff-Respondent,

v.

Charles HAINEY, Defendant-Appellant.

No. 49855.

Supreme Court of Missouri,

Division No. 1.

Dec. 9, 1963.

R. H. McRoberts, Harold I. Elbert, St. Louis, for plaintiff-respondent. Bryan, Cave, McPheeters & McRoberts, Susman, Willer, Rimmel & Elbert, St. Louis, of counsel.

Merle L. Silverstein, Rosenblum & Goldenhersh, St. Louis, for appellant.

WELBORN, Commissioner.

■ This is an action to set aside a deed for undue influence, forgery and lack of mental capacity of the grantor. The trial court found that the grantor lacked "sufficient physical or mental capacity" to execute the deed and ordered it set aside. This appeal is from that judgment. Because title to real estate is involved, we have jurisdiction.

Mabelle Elizabeth Gruetzmacher and her husband, Gustav, owned, as tenants by the entirety, property at 8239 Glen Echo Drive in St. Louis County. They lived in a two-story house built by them at that location in 1938. They had one child, Wilbur, the respondent here. In 1941, Mr. Gruetzmacher died. In 1945, his widow married Charles Hainey, the appellant here, and they continued to live at the Glen Echo house.

In January, 1960, Mrs. Hainey, who had previously been a healthy, active person, became ill. In March, 1960, she entered Jewish Hospital in St. Louis because of jaundice. On March 18, 1960, an exploratory operation was performed and cancer of the liver with metastasis, or spreading, discovered. The disease was in such an advanced stage that no treatment, surgical or otherwise, was undertaken. Mrs. Hainey was not informed of her condition.

While in the hospital, Mrs. Hainey, on March 26, executed a will. She devised the Glen Echo property to Wilbur, if living, and, if not, to his wife, Ethel. Specified personal property was also bequeathed to Wilbur. A bequest of $500 was made to Mrs. Hainey's mother. The remainder of her estate was to go to her husband, if living, otherwise to Wilbur, who was named executor.

On April 1, 1960, Mrs. Hainey returned home from the hospital. She remained there until her death on June 3, 1960. The deed in question was executed on May 27, 1960. By it Mrs. Hainey transferred the Glen Echo property to herself and her husband, Charles, as tenants by the entirety.

The deed was recorded on the date of its execution. By this action Wilbur sought to have the deed set aside and title decreed in him under the March 26, 1960 will of Mrs. Hainey, which had been admitted to probate, subject to respondent's rights as executor under the will.

As for the evidence bearing on the issue of the mental capacity (to which we confine our review inasmuch as if that element is lacking, the physical capacity of the grantor would be immaterial), there is not the usually found conflict in the testimony of the two parties to the litigation. The difference relates largely to the effect and weight of the testimony. Respondent's principal witnesses were his wife, Ethel, and Dr. Solon Harris, M.D., who attended Mrs. Hainey before and after she entered the hospital. According to Ethel, she and her husband had, prior to the hospitalization of Mrs. Hainey, gotten along well with the Haineys. Ethel and respondent were married in 1935 and went to live with the Gruetzmachers at that time. They moved with them to the Glen Echo residence in 1938 and continued to live there until 1945, when, at about the time Mrs. Gruetzmacher married the appellant, they purchased a house of their own. Thereafter, they and the Haineys visited regularly. According to Ethel, she and her husband would have dinner in the Hainey home at least once a week.

After the operation and while Mrs. Hainey was still in the hospital, an encounter took place at the hospital between Mr. Hainey and the Gruetzmachers in which Hainey, according to Ethel, stated: "All you are coming in here for is her property. I am her husband. Everything she has is mine. When she married me she forsook the family and nobody knows what she has. And I am furious with Doctor Gruenfeld for telling her." After this incident, Ethel told Mrs. Hainey that Doctor Gruenfeld, the surgeon who had performed the operation, had suggested that Mrs. Hainey should, "in view of this friction," have a will. According to Ethel, Mrs. Hainey said that she had been wanting to make a will for some

time, but she "thought Charlie would have to sign also." Notes of Mrs. Hainey's wishes were made by Ethel, who was a secretary to an attorney. She got in touch with an attorney not connected with the firm by which she was employed, who prepared the will as described above and brought it to the hospital where it was executed.

After Mrs. Hainey returned home on April 1, respondent and his wife visited her about every other night for the first two weeks. During that time, Mrs. Hainey was up and around and went to the table for her meals. Gradually, however, her condition became worse. She began, according to Ethel, "to refuse food or, if she did eat, she couldn't keep it down. And she became more yellow and thinner and finally didn't want to get up at all. She just lay in bed all the time." When she reached that stage, respondent and his wife visited her every night.

Around the middle of May, Wilbur and Ethel were visiting Mrs. Hainey and appellant asked whether or not they had Mrs. Hainey's bank book. Mrs. Hainey had, prior to entering the hospital, given Wilbur a passbook for a savings account in the joint names of Mrs. Hainey and Wilbur. After Mr. Hainey's inquiry, Mrs. Hainey told Wilbur to tell her husband that she had given her son the passbook some time prior to entering the hospital. Ethel testified that Mrs. Hainey said: "He has been fighting for a bank book and title for three days." The testimony indicated that the title referred to related to the Glen Echo property. On the second or third subsequent visit, Wilbur, in response to appellant's continued requests, gave him the passbook. Following Mrs. Hainey's death, respondent realized approximately $4,300 from the account.

Ethel described Mrs. Hainey's mental and physical condition at the time of this incident as follows:

"Sometimes she would not even recognize us. If she would, she would put up her hand in recognition and close her eyes and lie there in the bed. Sometimes we would ask her something and she would ramble on incoherently and then again maybe she would say a few words we could understand. * *

"When I asked her what she wanted the bank book for she would start off rambling, 'We are out of money. I have to use my own money.' Then repeat that over and over again. Then I couldn't get any more out of her."

Respondent and his wife last saw Mrs. Hainey on May 23. At that time, by Ethel's testimony, appellant shouted at them about Mrs. Hainey's property, saying: "I've been talking to people and the house is mine." In view of the appellant's attitude, the Gruetzmachers did not return and kept in touch with Mrs. Hainey's condition through the Visiting Nurses Association. Mrs Gruetzmacher described Mrs. Hainey's condition, when she last saw her on May 23 and for the two or three preceding nights, as follows: "She just lay there in a coma, would not even speak or say anything." Ethel and Wilbur could not carry on a conversation with her. Mrs. Hainey did not recognize them toward the last. "I would ask her, 'You want a drink of water?' Maybe she would nod her head and after bringing it she would shake her head she didn't." She ate nothing. Ethel and her husband brought liquids that she could sip through a straw. She was unable to hold the straw herself. The last words Ethel heard Mrs. Hainey say were: "I am in agony."

On cross-examination, respondent's wife acknowledged that, after the marriage of the appellant and Mrs. Gruetzmacher, appellant had worked for several years until he retired and thereafter he received social security benefits. Except for $7,000 in insurance which Mrs. Hainey received on the death of her husband, the appellant had provided for Mrs. Hainey and generally maintained the Glen Echo house. The cost of the upkeep of the Glen Echo property was estimated at $2,000 per year.

Dr. Solon Harris, who was Mrs. Hainey's physician when she entered the hospital, saw her twice after her discharge. He saw her about a week after she went home and for the last time on April 16. He prescribed phenobarbital and codeine for relief of her pain. He described her condition as "lethargic, * * * in a stuporous condition. She was hazy. Mrs. Hainey was a very alert woman when I first knew her and I could see, which was expected, she was going downhill rapidly." He expressed the opinion that she was not mentally competent at the time of his last visit.

Doctor Harris kept in touch with Mrs. Hainey through the visiting nurses. He stated that, about two or three weeks after his last visit, one of the nurses called and told him Mrs. Hainey was in pain. He prescribed dolophine hydrochloride, a much stronger drug, administered by injection and used as a substitute for morphine. Doctor Harris ordered dolophine for Mrs. Hainey on May 27. He stated he thought that order was merely the last which he made and that he had ordered it previously. However, the nurses' notes do not indicate use of the drug prior to May 28.

On cross-examination, Doctor Harris acknowledged that the stupor which he observed on his last visit was related to some extent to the drugs which Mrs. Hainey was receiving for relief from pain and that the effects of the drugs would fluctuate depending upon the time which had elapsed since they had last been taken. He stated that, in view of the fact he did not see Mrs. Hainey after April 16, he had no opinion regarding her competency on May 27. He did state that her condition from the time he last saw her would not have been "apt to change for the better" and that the tendency would have been to require more drugs as time went on.

Other witnesses for the respondent were Mrs. Hainey's brother, Harry Wagner, and an aunt, Jenny Karr. After Mrs. Hainey returned from the hospital, the appellant stated that her 92-year old mother, Mrs. Wagner, who had lived with Mrs. Hainey for 50 years, was making her sick and that she should go elsewhere. Arrangements were made for her to do so. Harry Wagner took her from the Hainey residence on May 20. He testified that he saw Mrs. Hainey at that time, but that she did not respond when he asked how she felt. He testified that Mrs. Hainey's mother went in as she was leaving and said: "Good-bye, I'm leaving." Mrs. Hainey made no response. Wagner said that she appeared to be asleep and no attempt was made to awaken her.

Mrs. Karr stayed with Mrs. Wagner while Mrs. Hainey was in the hospital. On one occasion while she was there, appellant told Mrs. Karr: "I said to Mabelle, if she would let me have a room in the house, and she said 'No,' * * *." Mrs. Karr was at the Hainey house along with her sister-in-law for two hours on May 23. At that time Mrs. Hainey was in a large chair in the kitchen. Mrs. Karr said she spoke to her, but that "she sat there and she never opened her eyes or she never answered me." Mrs. Karr did not hear Mrs. Hainey say a word while she was there. She stated that Mrs. Hainey's eyes were closed, but she could not say whether or not she was asleep.

A nurse employed by the Visiting Nurses Association, Geneva Montjoy, identified the nurses' records of calls on Mrs. Hainey. Mrs. Montjoy made some of the calls herself, but not all of them. The visits began on May 10, when the record described Mrs. Hainey as an "Elderly critically ill female. Confined to bed. Up to bathroom only. * * * Fairly alert. Speaks coherently with intervals of rambling talk." On the second visit, May 16, the note described her condition as "still very low * * *. Rampant pain. Loses contact for brief intervals. Coherent at others * * *." May 19—"Patient critical. Husband thinks patient improved due to sleeping most of the time * * *." May 21—"Patient up in chair and husband making bed * * *." May 23—"Sitting propped in chair in kitchen. Husband not home. Relative with patient. Grunting and groaning as though

in much pain." May 24—"Slightly more alert * * *. Condition weak." May 25 —"Continued poor condition." May 26—"Complains of generalized pain." May 27—"Took moderate serving ice cream * * *. Had poor night. Refuses to go to nursing home * * *." Mrs. Montjoy made the call on the 27th. She could not place its time other than in the afternoon. She could not recall, but stated that her notes indicated that she had a conversation with Mrs. Hainey at that time.

The May 28th note described Mrs. Hainey's condition as "weak" and refers to the administration of dolophine for the first time. May 29—"Less groaning and restlessness." May 30—"Restless. Gruntlike responses." May 31—"No improvement." June 1—"Seems semi-comatose." June 2—"Not responding." June 3—"Message from M.D.—Patient expired, 6/3 A.M."

Respondent's evidence included testimony of a handwriting expert who had examined the signatures of Mrs. Hainey on the deed and an affidavit as to tenancy by the entirety executed in conjunction with the deed. He stated that, in his opinion, the signatures on the documents were not those of Mrs. Hainey, but were those of the appellant.

The appellant's evidence was limited to the preparation and execution of the deed and affidavit. Three witnesses were called, Clayton J. Lane, an attorney, who prepared the deed and affidavit and who was present at their execution; Vera Sheridan, a notary public, who took the acknowledgment of Mrs. Hainey, and Mary Lou Maginn, a neighbor of the Haineys.

Lane, an attorney admitted to practice in 1926, testified that he had represented Mr. Hainey on minor legal matters prior to April 28, 1960. On that date, the appellant called and asked him to come to the Hainey house. Lane did so on May 5. After discussing other matters, Hainey remarked about his wife's illness and his uncertainty about the title to their residence. He asked Lane to check the record. Lane did so and, on May 12, returned to the Hainey residence. He told Hainey that title was in the name of Gustav H. Gruetzmacher, Jr. and Mabelle Gruetzmacher, his wife. Lane stated that, on this visit, he explained to Mrs. Hainey the status of the title. According to Lane, "she assented and told me that it would be all right, words to that effect. * * * to prepare the warranty deed. * * * from Mrs. Gruetzmacher to Mr. Hainey and Mrs. Gruetzmacher (sic)." Lane prepared a deed and an affidavit regarding tenancy by the entirety and on May 24 took them to the Hainey residence and exhibited them to Mrs. Hainey. According to Lane, at that time, Mrs. Hainey asked two or three questions about the transaction. "I wouldn't just exactly remember then what her questions were, but, after the conversation was just about over, then I asked her, * * * 'Is this the way you want this matter handled?' And she says, 'That's the way I want it.' That's exactly her words." According to Lane, Mrs. Hainey was then sick and weak, but "she was alert." There was some indication that the deed was tendered to Mrs. Hainey at that time.

In any event, Lane returned with the deed and affidavit on May 27 at around 3:30 in the afternoon. After going to the house, he went to the Normandy City Hall and got Mrs. Sheridan, the city clerk and a notary public. When they entered the house, Mrs. Hainey was sitting in a chair in the kitchen, propped up by pillows. Because Mrs Sheridan wanted to verify the identity of Mrs. Hainey, Mr. Hainey got Mrs. Maginn who lived two doors away. According to Mrs. Maginn, when she entered the Hainey house, she patted Mrs. Hainey on the shoulder and nodded and Mrs. Hainey looked at her and nodded back. Mrs. Maginn testified that Lane read the papers "from beginning to end" and then said to Mrs. Hainey, "Now, do you understand exactly what these papers are and what you are doing? This house was in your former husband's name, your name and his, and you are now changing it to Mr. and Mrs. Charles Hainey. He said: 'You under-

stand perfectly what you are signing,' and she nodded. * * * She was reclining. She was nodding, yes, she nodded to him. She didn't talk. She didn't have her teeth in."

Mrs. Sheridan recalled that Mrs. Hainey "nodded one time, when Mr. Lane explained one time. She nodded and shook her head." She said that Mrs. Hainey "might have said yes, I'm not sure." Mrs. Maginn heard Mrs. Hainey say only one word, "Charlie," which Mrs. Sheridan also heard. Appellant's response was: "Just a minute, mama, I'll put you to bed right away."

Lane testified that he explained the warranty deed and said to Mrs. Hainey: "Now, is this what you desire to do?" According to Lane, "she nodded and says yes. Very feeble, but she said yes. I wanted to make certain she knew what she was doing. She was a sick woman, I knew."

The three witnesses agreed that Mr. Hainey "guided" his wife's hand upon the signing of both the deed and affidavit. They stated that Mrs. Hainey held the pen and started to sign, but when she had difficulty appellant asked whether or not he could help her. When told it was permissible, he took her arm in his hand (upon the exact point, the witnesses did not agree) and assisted in the signing of both documents.

Lane filed the deed and affidavit in the recorder's office on May 27, at 4:52 o'clock P.M.

■ "In reviewing the case, we have the duty to weigh the evidence and reach our own conclusion as to its weight and value, giving due regard to the trial chancellor's opportunity to judge the credibility of the witnesses." Farr v. Lineberger, Mo. Sup., 207 S.W.2d 455, 459[2–4]. The burden of proof was upon respondent to prove by convincing evidence that, on May 27, Mrs. Hainey lacked mental capacity to execute the deed. Sullivan v. Winer, Mo. Sup., 310 S.W.2d 917, 921[2, 3]; Cruwell v. Vaughn, Mo.Sup., 353 S.W.2d 616, 624

[1–6]; Farr v. Lineberger, supra. The question is whether on that day she had sufficient mental capacity to understand the nature and effect of the transaction. Spaeth v. Larkin, Mo.Sup., 325 S.W.2d 767, 772 [9]; Cruwell v. Vaughn, supra. Less mental capacity is required to make a gift conveyance than a deed which is part of a regular business transaction. McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 703 [5, 6]; Cruwell v. Vaughn, supra.

■ Weighing the evidence on behalf of the respondent, we find it sufficient to satisfy the burden upon him to show that Mrs. Hainey was, on May 27, incompetent to execute the deed. The weakened condition of Mrs. Hainey obviously involved not only her physical state but also her mental faculties. Her inability to perform the most simple and routine everyday functions, such as feeding herself, her non-recognition of the members of her family and her loss of contact point to a person who, as of the last date of the respondent's direct testimony, May 23, was in a condition which would not, and, obviously, in view of her death ten days later, did not improve. No conversation passed between Mrs. Hainey and her son and daughter-in-law on their last three visits. The last words which her daughter-in-law heard her say were "I am in agony."

The appellant would give little value to the testimony of Doctor Harris because he last saw Mrs. Hainey on April 16 and mental incapacity must be shown as of the time of the execution of the deed in question. However, it is obvious that Mrs. Hainey's condition declined almost steadily after Doctor Harris last saw her. He expressed the opinion that at that time she was not mentally competent. His testimony was that her condition would not have been apt to improve after his last visit and that she would require increasing doses of drugs.

The appellant argues that Doctor Harris' opinion of Mrs. Hainey's incompetency on April 16 was based substantially upon

the condition which drugs produced. Indeed, Doctor Harris did testify that her condition was in part due to drugs and that, insofar as he knew, her brain had not been attacked by disease. As appellant states, Doctor Harris did testify that the effect of drugs would fluctuate, depending upon time between their administration. However, we disagree with appellant's analysis of the testimony as showing that "Mrs. Hainey's incompetence was a temporary condition which would wear off if she did not receive the regular drug injections; and there is no evidence whatsoever that she received any such injection during the month of May, at least prior to May 28, 1960." Doctor Harris testified that, at the time of his last visit, Mrs. Hainey was receiving codeine and phenobarbital, both of which were administered orally, not by injection. According to Doctor Harris, "she was getting phenobarbital and codeine constantly." Although he did not see Mrs. Hainey again, he kept in touch with her condition through the visiting nurses. Dolophine, administered by injection, was ordered on May 27, when, according to Doctor Harris, the phenobarbital and codeine which he had prescribed did not alleviate the pain. Significantly, Doctor Harris prescribed the more powerful drug on May 27, the date on which the deed was executed. Although it was apparently not administered prior to May 28, the fact that this drug was ordered on the 27th would indicate the deterioration of Mrs. Hainey's condition by that date.

Furthermore, the nurses' notes show an almost steady and gradual worsening of Mrs. Hainey's mental condition. The notes do indicate that, on May 24, she was "slightly more alert." However, the fact that a slight improvement would be of such significance to warrant the note would indicate a previous lack of alertness as respondent's witnesses testified. There is no indication whatsoever of any subsequent or continued improvement in her alertness. There is indication of a conversation with the nurse on the 27th, the date of the deed.

However, the nurse could not recall what had been said. Insofar as the notes show, the conversation related to Mrs. Hainey's physical condition. Her response in that regard would not warrant a conclusion, in view of the other evidence concerning her condition, that she had sufficient mental capacity on that date to execute the deed.

Appellant points out that, in the daughter-in-law's testimony, there was evidence of a rational conversation regarding a bank book around May 15. Testimony did show that, at that time, Mrs. Hainey was aware of the fact that she had previously given the passbook for the joint account to her son. The evidence does not show, as appellant's reply brief states, that the bank book was given to the son at that time. On the contrary, it shows that the book was actually given to him prior to the time that she entered the hospital.

In any event, there is some doubt that the conversation which appellant points to as intelligible was wholly such. Mrs. Hainey said: "We are out of money. I have to use my own money." However, evidence showed that there was a balance of some $3,000 in a joint bank account in the names of Mr. and Mrs. Hainey. In such case, it would appear either that she was, for some reason, mistaken about her financial status, or that the remark was not that of a coherent, competent person.

Upon consideration of respondent's evidence, we feel that the inference that the grantor's mental condition as shown by such evidence continued to the day of the execution of the deed is warranted and that a finding of lack of mental competency on May 27 would be called for, absent evidence by the appellant to rebut the effect of the respondent's testimony. We look, then, to the appellant's evidence. No witness testified to any conversation on the part of Mrs. Hainey at the time the deed was signed. Lane stated that he heard her say a "very feeble" "yes" in response to one of his statements of explanation. Mrs. Sheridan was uncertain whether or

not she heard Mrs. Hainey say "yes." Mrs. Maginn saw Mrs. Hainey only nod her head, apparently affirmatively. Both Mrs. Sheridan and Mrs. Maginn heard Mrs. Hainey say "Charlie." In view of his response, "Just a minute, mama, I'll put you to bed right away," this must have been a plea for assistance and not an indication of mental capacity.

In our opinion, the appellant's evidence does not overcome the inference of mental incapacity which respondent's evidence raises. In weighing the evidence, we are aware, as above pointed out, that mental capacity to make a gift is less than that required for a bargaining transaction. This obviously was a gift. However, where, as here, the gift is a product of the grantee's suggestion, there should be more convincing evidence than has been presented here to overcome the inference of lack of mental capacity. The appellant's testimony clearly shows that Mrs. Hainey was not the person who originated the idea that the house should be transferred to her and Charles as tenants by the entirety. Less than two months before, she had made a will in which she devised, consistently with their close relationship, the house to her son. In doing so, she did not ignore the appellant. He would succeed to a four-family flat and there was evidence of a savings account which he would receive. From the aunt's testimony, we find that, around the time the will was made, appellant asked Mrs. Hainey to provide at least a room for him in the house, but she declined to do so. Insofar as appears, that was her attitude when her faculties were unimpaired. She could, of course, subsequently have changed her mind. However, her remarks around May 15, referring to appellant's fighting for three days about a title, did not evidence a changed attitude.

Indications are that on the visit of May 24 Mrs. Hainey in fact rejected the proposed deed. Lane was a notary public and could have taken the acknowledgment, had Mrs. Hainey signed in his presence. On direct examination, when asked the reason for not executing the deed on the 24th, Lane stated: "I can't answer that question. I don't know the reason. In fact, I don't think there was just exactly any preparation. I feel like there was a phone conversation between Mr. Hainey and myself and I didn't say definite what day I would be out and I told him the next day or probably the second day."

On cross-examination, he admitted that it was "possible" that, as he testified in his deposition, he "tendered the deed at that time and Mrs. Hainey shook her head 'No.' She said, 'That's all right.'" While Lane stated that he "went most on her last words," "That is the way I want it," it would appear that her reference might well have been to the status quo since she rejected the deed to change it.

■ Comparison of the evidence in this case with that of the numerous reported cases involving similar circumstances avails little. Each case must be decided upon its own facts. We will, however, refer briefly to cases cited by the appellant. We, of course, recognize that the question of mental capacity must be determined as of the date of the deed in question. Here we can and do infer that the condition concerning which the witnesses testified continued to that time. We do not have the benefit of clear and convincing evidence to rebut this conclusion such as was found in the cases of Cruwell v. Vaughn, Mo.Sup., 353 S.W.2d 616; Gaugh v. Webster, Mo. Sup., 297 S.W.2d 444; Lastofka v. Lastofka, 339 Mo. 770, 99 S.W.2d 46; Sullivan v. Winer, Mo.Sup., 310 S.W.2d 917, all cited by appellant. The cases of Lorraine v. Dixon, Mo.Sup., 356 S.W.2d 96, and Miller v. Minstermann, Mo.Sup., 266 S.W.2d 672, also cited, involved deeds alleged to be void on the grounds of fraud and mistake, and, on their facts, are not comparable with the situation here presented. In each of the four cases first cited, although the grantor was suffering from a disability which had previously affected his mental capacity, there was direct evidence on the part of

the person who prepared the deed that the grantor's conversation showed clearly an awareness of the nature and effect of the transaction. Furthermore, except for Gaugh, the grantor in those cases sought out the person who prepared the deed. In Webb v. Heddleson, Mo.Sup., 327 S.W.2d 101, also cited by appellant, the court referred to testimony by the notary public who took the acknowledgment to the deed that the grantor "was mentally sound, knew the nature and extent of his property, the natural objects of his bounty and fully understood the nature of the transaction * * and was indeed mentally capable of executing the deeds at the time they were executed." 327 S.W.2d 103.

The contrast between the evidence considered sufficient in those cases to support the deed and that here offered for that purpose is striking. In making such comparison, we do not, of course, place the burden of proof upon the appellant to support the deed. The burden was upon the respondent to overthrow it. However, in view of the respondent's evidence, appellant should have come forward with testimony to show mental capacity at the time of execution of the deed. In this the testimony fails.

In reaching our conclusion, we also consider the evidence concerning the signing of the deed and affidavit. The evidence is clear that appellant actually performed, through Mrs. Hainey's weak and impotent hand, the act of signing the deed and affidavit. Mrs. Hainey could, of course, have adopted the signature made by another person (Spaeth v. Larkin, Mo.Sup., 325 S.W.2d 767, 772[10]), but, again, only if she were competent to know what was in fact being done and consented thereto.

Also of significance is the fact that, after the deed, according to Lane, had been signed at around 3:30 P.M., it was filed for record at 4:52 P.M. on the same date. This unseemly haste to place the deed on record may well signify doubts about the efficacy of the transaction. See Vining v. Ramage, 319 Mo. 65, 3 S.W.2d 712, 720 [4].

The judgment is affirmed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.