Beatrice **CHICHIZOLA**, Executrix of the Estate of Mary Zubiena, Deceased, Respondent,

v.

James B. **SALARANO**, Sr., Appellant.

No. 53652.

Supreme Court of Missouri, Division No. 2.

April 14, 1969.

Albert A. Michenfelder, Jr., Ziercher, Tzinberg, Human & Michenfelder, for plaintiff-respondent.

Walter S. Berkman, Herman D. Olian and David G. Dempsey, Clayton, for defendant-appellant.

BARRETT, Commissioner.

This is an action by the executrix of the estate of Mary Zubiena to set aside the transfer, on March 27, 1964, of 294 shares of stock of American Telephone and Telegraph Company. The plaintiff executrix is Mrs. Zubiena's daughter, age 55, and the defendant James B. Salarano, Sr., is Mrs. Zubiena's brother. (Incidentally, in addition to the plaintiff daughter, Mrs. Zubiena, an Italian immigrant, was survived by four living sisters, one a resident of Italy, and one brother, the appellant James.) Prior to March 27, 1964, the shares of stock were in the joint names of the plaintiff-daughter, Beatrice Chichizola, and her mother, and on that date the stock was transferred to the joint ownership of the defendant-appellant, Salarano and Mrs. Zubiena. The trial court canceled the transfer, found that appellant had no right or title in the stock and ordered its transfer to plaintiff executrix. The parties stipulated that the stock was of the value of over $40,000.00 on the date of transfer and while respondent's counsel makes the curious observation, "we are in doubt as to jurisdiction," he at the same time asks the court to take judicial notice that on the date of trial (the date of appeal is determinative) the 294 shares "were worth well in excess of $15,000.00," thus tacitly conceding that on the date of the appeal (January 26, 1968) jurisdiction of the cause was appropriately in this court and the respondent's motion to transfer the cause to the St. Louis Court of Appeals is denied. See Odom v. Langston, 351 Mo. 609, 173 S.W. 2d 826, and compare Moretti v. Gustafson, Mo., 433 S.W.2d 809.

Mrs. Zubiena's husband died in 1955. In addition to the plaintiff, Beatrice Chichizola, whose husband is a dentist, the Zubienas had two other children, boys 12 and 14 when they were killed in 1919 when their father's automobile and a train col-

lided. After her husband's death Mrs. Zubiena continued to live alone in the family home in Webster Groves. In 1962 she sold the home and moved into the Plaza Square Apartments where she continued to live until July 7, 1964, when she broke her hip and was confined in St. John's Mercy Hospital until August 5, 1964. Thereafter she was taken to St. John's Chronic Hospital and then to St. Ann's Home where she died on April 23, 1967.

It does not appear just how and when Mrs. Zubiena came into ownership of the A. T. & T. stock. In any event, shortly after the father's death in 1955 Mrs. Zubiena had the stock transferred into joint ownership with her daughter, Mrs. Chichizola. She also maintained a lock box at Mercantile Trust, in which the daughter was the "alternate." She kept the stock certificates in her lock box and after the sale of the house for $13,853.00 she kept two certificates of deposit, $10,000.00 and $2000.00, in the box. At the time of her death Mrs. Zubiena had a checking account of $468.21 and her household furniture and personal effects were valued at $200.00. The total of these items plus the value of the stock at approximately $40,000.00 comprised Mrs. Zubiena's total estate. After her husband's death her income consisted of her social security payments, the interest on the A. T. & T. stock and the interest on the certificates of deposit.

The plaintiff said of her father and mother, "they adored each other; and you never saw such a loving couple." In business matters Mrs. Zubiena relied entirely on her husband. In addition, her education extended only to the fourth grade, she read very little and did not attempt to write very much—usually had someone else fill out the checks she signed. After the father's death in 1955 the plaintiff stayed in her mother's home for a few days and thereafter went to see her several times a week and "then it was once a week and like that." During that time Mrs. Zubiena was able to look after herself and her affairs including the sale of her house. She could not drive an automobile and the plaintiff and others took her to church, shopping and wherever she desired to go. After she moved into the Plaza Square Apartments in November 1962 the plaintiff and members of her household as well as others continued to visit her, take her places and run her errands.

Mrs. Zubiena was 79 years old when she moved into the apartment. Then as before she rather frequently saw and was treated by Dr. Hammond. During this period, 1962 to 1964, she had an appendectomy from which she made a remarkably good recovery. On July 7, 1964, Mrs. Zubiena fell and fractured her pelvis and for this she was hospitalized until August 5 and never returned to her apartment. On May 28, 1965 she was declared incompetent, the plaintiff was appointed her guardian and the inventory of her estate, in the language of appellant, "reflected a claim to the stock." As stated, she died at age 84 on April 23, 1967, and the plaintiff became the executrix of her estate, the inventory again "reflected the claim to the stock." This action to set aside the stock transfer was instituted on June 9, 1965, shortly after the plaintiff's guardianship.

In brief the immediate circumstances of the stock transfer were that very much to Mrs. Chichizola's surprise, on March 27, 1964, (Good Friday, a very important date to all these devout people) Mrs. Zubiena appeared at her home, 4347 Maryland, at first she thought alone. This is her description of the visit: "Well, mother was at the door and I opened the door, greeted her, and she had a piece of paper. She says, 'Run upstairs, get your pencil and sign this.' And I said, 'Well, mom, come in.' So she stepped in the door and I took the paper and looked at it. And my husband then came and he says, 'Well, come on up, mom.' So she kept saying 'No.' Up until this time I thought she was alone, and then my husband helped her up the steps, got her up the steps; that was then when my uncle (the appellant) appeared

and he came up. * * * So we have a chair there; mom sat down and she says, 'I want you to sign this.' So I said, 'What is it?' She says, 'Just sign it.' So I signed it. I read it and signed it. But before I signed it I said, 'Mom, what are you going to do? Sell this?' She says, 'Yes, I am going to sell it.'" And thus the plaintiff-daughter signed "a separate stock power" that had been prepared by the "security supervisor" of Southwestern Bell Telephone Company. Shortly thereafter the plaintiff learned that the stock had been transferred to the joint names of her mother and her uncle. She says, incidentally, that in October 1964 her mother asked, as did plaintiff, Mr. Salarano to return the stock and on each occasion he refused. It turned out (the present statement of facts is adapted from the appellant's brief) that when Mrs. Zubiena and her brother, the appellant, appeared at the transfer office of A. T. & T. the supervisor explained to them the status of the stock and the necessity of securing the plaintiff's "stock power" before it could be transferred to their joint names. The appellant relies most heavily upon the testimony of this witness for their contention that Mrs. Zubiena was of sound mind on March 27, 1964.

It is not necessary to encumber this opinion with the great mass of factual detail adduced by the parties in support of their conflicting claims. Neither is it necessary to restate the general rules or to match and distinguish a series of cases. The appellant-uncle contends that the court erred in concluding that Mrs. Zubiena lacked sufficient mental capacity to make the stock transfer because he says "(t)he testimony of plaintiff herself, and by far *the greater weight of all the credible evidence,* establishes that deceased did understand the nature of the stock transaction, that she was able to carry on the ordinary affairs of life, that she did know the nature and extent of her property, and that she did recognize those persons who were the natural objects of her bounty. * * * Therefore, plaintiff's evidence showing that deceased was forgetful, confused, had arteriosclero-

sis, habitually gave little (useless) things to her relatives, left parties early, and dreamed about her deceased husband (had actually seen and talked to him) and boys was not sufficient, as a matter of law, to establish any contrary conclusions." (Emphasis supplied.) In this connection it is urged that the court erred in concluding that Mrs. Zubiena "was motivated in making the stock transfer by an insane delusion that she had been directed to do so by her deceased husband and parents (sic). There was no other evidence introduced indicative that deceased had an unsound mind, and therefore nothing to corroborate any erroneous belief she might have had of communicating with her husband and parents." While witnesses for both respondent and appellant testified to Mrs. Zubiena's belief that she had seen her deceased husband in heaven and that he had communicated with her sometimes in her dreams if in point of fact the finding of unsound mind is supported and found, it is not necessary to consider whether she was also incapable of making the transfer because of a disabling "insane delusion." Gruetzmacher v. Hainey, Mo., 373 S.W.2d 45, 46. The appellant's position has been thus set forth in elaborate detail in an effort to further obviate the necessity of a detailed recitation of the evidence; the mere statement of his position, "the greater weight of all the credible evidence," and the recitation in his assignment of error of plaintiff's proof concede plaintiff's proof and question only its "weight" and "as a matter of law"—whatever in these circumstances the latter may mean. One other significant factor should be noted, the appellant relies upon instances and cases in which in will contests, jury-tried cases, (Lewis v. McCullough, Mo., 413 S.W.2d 499) in which verdicts were directed for proponents or suits to set aside deeds in which the court found the grantor of sound mind (Walton v. Van Camp, Mo., 283 S.W.2d 493) or even on appeal, it appearing that there was some reasonable basis for a father to prefer a grantee-daughter over four other children and this court made a

finding contrary to that of the trial court as in Cruwell v. Vaughn, Mo., 353 S.W.2d 616 and Vineyard v. Vineyard, Mo., 409 S.W.2d 712. In the Walton case the court found no evidence of incapacity and concluded "The weight of the competent and credible evidence is strongly in accord with the findings of the trial chancellor."

While there was testimony by lay witnesses of the oddities of old age, sickness, forgetfulness, inability to recognize old friends, members of her own family and even lay opinions of unsound mind, the insuperable difficulty with the appellant's position in this case is the additional, supporting, unrefuted and persuasive medical testimony. Dr. Hammond, an internist, was Mrs. Zubiena's treating physician from 1948 until her death in 1967. Dr. Hammond, speaking of his earlier years and contacts said this, "Well, she was always a very unstable person as far as her emotional and nervous system was concerned. She did have a mild hypertension, or increase in blood pressure, which we were treating constantly with sedatives. She was a very forgetful person on many occasions." And speaking of later years, "And I'd say about 1960, '61 and '62 she would have at times episodes where she'd get dizzy, and she had falls on occasion. She came into the hospital one time with an experience of a very weak spell, dizziness, vomiting, nausea, which then cleared up. Some of these could or might have been in the category of what we call small or mild strokes." In 1963 she had some knee trouble which "she contended was due to rounding of the heels or something, and apparently was due to nothing more than just arthritis which she had for years; but she made an issue of that and wanted a suit." Dr. Hammond said that she moved into the apartment alone against his advice. He conceded that she did do certain things, nevertheless he described her condition as senility and arteriosclerosis and it was his opinion that her description to him of her deceased husband "counseling her what to do" was indicative of an unsound mind. He thought her condition became progressively worse after the hip fracture in July 1964 but he said that even before she fell, before July 1964, he did not think her judgment as to the nature and extent of her property would be good: "I doubt that she had a very clean-cut knowledge of her financial affairs." On cross-examination, referring to Mrs. Zubiena's senility and arteriosclerosis and her failure to recognize people he said that they were all manifestations of an unsound mind. And finally in answer to the hypothetical question which need not be detailed here Dr. Hammond gave it as his opinion that on March 27, 1964, she was of unsound mind.

In addition, Dr. Stryker, a psychiatrist, at the request of Dr. Hammond, examined Mrs. Zubiena on May 19, 1965 and he found her completely "disoriented as to time." His diagnosis was "chronic brain syndrome, secondary to cerebral arteriosclerosis" and he said "My opinion was that she was definitely of unsound mind." And in answer to the hypothetical question and the stock transfer on March 27, 1964, he was of the opinion that she was of unsound mind. He conceded on cross-examination that she might do certain routine things, buy groceries, perhaps recognize her relatives but he said "I would say she was incompetent to handle anything that was out of the ordinary routine" and as to knowing the extent of her property "I don't think she would be completely aware." As to her dreams "That individual who responds to what they are told to do in dreams I would consider to be of unsound mind."

The medical evidence here unlike that in Rex v. Masonic Home, 341 Mo. 589, 108 S.W.2d 72, was not based alone on response to mere hypothetical questions, in one case it was based on fifteen years' treatment and observation and in the other, at least in part, on personal examination. It is not necessary to further demonstrate upon the record, each case is to be determined on its particular facts (Gruetzmacher v. Hainey, supra); it is sufficient here to say that the evidence and the facts

as found by the trial court meet all the tests of the well-reasoned opinion of Flynn v. Union National Bank, Mo.App., 378 S.W. 2d 1. And in conclusion it may be said that this court upon careful review of the record could not confidently come to another and contrary result and finding than the well-documented and supported finding of the trial court. Civil Rule 73.01(c) V.A.M.R.; Gruetzmacher v. Hainey, supra. Accordingly the judgment is affirmed.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

STOCKARD and PRITCHARD, CC., concur.

FINCH, P. J., MORGAN, J., and POW-ELL, Special Judge, concur.

DONNELLY, J., not sitting.